Filed 3/10/14  On rehearing

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| LINDA ADAMS et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>MHC COLONY PARK LIMITED PARTNERSHIP et al.,<br><br>    Defendants and Respondents. | F062160<br><br>(Super. Ct. No. 611455)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Hurl William Johnson III, Judge.

Endeman, Lincoln, Turek & Heater LLP, Henry E. Heater, James C. Allen and Linda B. Reich for Plaintiffs and Appellants.

Horvitz & Levy, Mitchell C. Tilner, Steven S. Fleischman; Robie & Matthai, Michael J. O'Neill, Craig W. Brunet; and Kenneth A. Kroot for Defendants and Respondents.

---

\*    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections I., II., IV.,V.B., V.C., V.D., V.E., VI. and VII. of the Discussion.

More than 80 residents of a 186-space mobilehome park sued the owner for failing to properly maintain the park's physical improvements and common facilities, including the park's sewer system, water pressure, electrical system, and matters related to security such as street lighting. The residents pursued claims for nuisance, breach of contract and negligence. After a 43-day jury trial, the jury found in favor of only six residents.

The losing residents filed this appeal, asserting instructional error, inconsistent special verdicts, and the erroneous exclusion of impeachment evidence.

We conclude that (1) the jury's findings that there were substantial failures to maintain the park's improvements, that did not affect a substantial number of people, can be reconciled with the jury's findings that there were no breaches of contract; (2) while erroneous, the instruction regarding the elements of a public nuisance was not prejudicial; (3) the purportedly erroneous instruction on the elements of a private nuisance claim caused no harm because the jury decided the private nuisance claims without reaching the disputed elements; (4) the trial court erred by concluding the park's rules and regulations were unambiguous and allowed the park to rent spaces for recreational vehicles;[1] and (5) the trial court did not abuse its discretion when it prohibited the use of a questionnaire for impeachment purposes because the questionnaire had not been produced during discovery.

We therefore reverse the judgment and remand for further proceedings on the claims that the park's owner rented spaces for recreational vehicles.

---

[1]    For convenience, this opinion uses the shorthand phrase *renting spaces for recreational vehicles* (and variants that use *rent* or *rental of*) to refer to Colony Park renting spaces to persons who intend to place a recreational vehicle on the lot in a manner not explicitly authorized by the park's rules. For example, living in a recreational vehicle placed on a lot, whether or not hooked up to utilities, is not explicitly authorized.

## FACTS

Appellant Linda Adams and over 80 other former and current residents of a mobilehome park named Colony Park Estates and located in Ceres, California (the Park) sued the owners and operators of the Park. They alleged the Park's improvements and common facilities had not been properly maintained. Only six of the plaintiffs obtained favorable verdicts and were awarded damages.

The appellants are Linda Adams and 62 other residents who did not prevail at trial. Unless the context indicates otherwise, the appellants are referred to as the "plaintiffs."

Equity Lifestyle Properties, Inc.[2] is the parent company of the entities named as defendants in this lawsuit. The named defendants include: (1) MHC Colony Park Limited Partnership, doing business as Colony Park Estates; (2) MHC Colony Park, L.L.C.; (3) MHC Financing Limited Partnership Two; and (4) MHC-QRS Two, Inc. The limited partnerships are the current or former owners of the Park and the two other entities are their general partners. For purposes of the verdict, the named defendants stipulated that they could be treated as one entity. In this opinion, we will refer to these entities as "defendants" or "Colony Park."

In this appeal, plaintiffs have not challenged the sufficiency of the evidence supporting the special verdicts or raised other issues that require a detailed description of the evidence presented at trial. Consequently, we will provide only a brief overview of the positions presented by the parties during the trial.

Plaintiffs contended that the Park was not properly maintained over the past 10 years. As to the Park's sewer system, plaintiffs supported their position by referring to (1) citations issued by the California Department of Housing and Community

---

[2] In *Manufactured Home Communities, Inc. v. County of San Diego* (9th Cir. 2011) 655 F.3d 1171, the court stated this entity was formerly known as Manufactured Home Communities, Inc. and was a real estate investment trust based in Chicago that owned and operated mobilehome parks throughout the United States. (*Id*. at p. 1173.)

Development (HCD) in 2001 through 2005; (2) testimony of an inspector for HCD whose first experience with the Park was a sewage spill in the 1990's; and (3) the testimony of many of the plaintiffs regarding their experiences with the system. The plaintiffs also challenged defendants' handling of abandoned mobilehomes and its maintenance of the Park's water system, electrical system, and common areas and facilities.

Defendants' theory of this case is that it was filed because the residents of the Park were unhappy with a rent increase. Defendants contend that after the notices of rent increase were sent in November 2005, the residents began to picket and advocate for the adoption of rent control. Defendants note the absence of written complaints about conditions at the Park before the rent increase was announced, its own policy of promptly acting on complaints by residents, and the increase in vandalism to the Park's sewer system after the rent increase was announced.

In short, the parties held very different views about whether problems existed, the severity of the problems, and the source of some of the problems—particularly whether residents vandalized the sewer system in retaliation for the increase in rent.

## PROCEEDINGS

Plaintiffs filed this action on December 1, 2006. The operative pleading is the first amended complaint (FAC), which included causes of action for nuisance, breach of contract, negligence, intentional interference with property rights, and various other claims. The FAC did not include claims for misrepresentation or fraud.

In the nuisance cause of action, plaintiffs alleged that defendants maintained a nuisance "by substantially failing to maintain the Park's common areas, facilities, and physical improvements in good working order and condition .…" The alleged failures to maintain concerned the sewer system, the water system, drainage, the electrical system, the streets within the Park, lighting and other security measures, the gas delivery system, the laundry facilities, the swimming pool, and other facilities. Plaintiffs also alleged that the Park's manager violated the Park's rules. Based on the alleged failures to maintain

4.

and violations of the Park's rules, plaintiffs asserted that "defendants created and maintained both a private and a public nuisance at common law and under Civil Code section 798.87."

The lawsuit was tried before a jury in August, September and October of 2010. On Thursday, October 14, 2010, the testimony of the last witness was presented. The court directed the jury to return the following Tuesday for instructions and final arguments.

On Friday, October 15, 2010, the trial court and counsel worked on the jury instructions. That afternoon, the court went on the record and stated: "I think for the most part we've reached an agreement [on] how we're going to instruct this jury." The court stated its understanding that the plaintiffs were going to proceed on causes of action for public and private nuisance, breach of contract and negligence, which plaintiffs' counsel confirmed.

The morning of Tuesday, October 19, 2010, prior to closing arguments, counsel for plaintiffs submitted a handwritten proposed jury instruction to the trial court regarding an implied contractual duty to maintain the Park's facilities and improvements in good working order and condition. Additional facts relevant to the untimeliness of this proposed instruction are discussed in part II.B, *post.*

Counsel's arguments to the jury were completed at the end of the day on Friday, October 22, 2010. The jury was directed to complete a "Special Verdict for Public Nuisance" (some capitalization omitted) and 47 special verdict forms for the claims of the individual plaintiffs for breach of contract, private nuisance and negligence.

As to the public nuisance claim, the jury found there was "a substantial failure by Colony Park to provide and maintain the physical improvements of the Park and the common facilities in good working order and condition." However, the jury also found the substantial failure did *not* affect a substantial number of people at the same time. On the second basis for the public nuisance claim, the jury found there was no substantial

5.

violation by Colony Park of the Park's rules and regulations. Therefore, plaintiffs obtained no monetary or injunctive relief under their public nuisance claim.

The special verdict forms for the claims of the individual plaintiffs contained 19 questions—three for breach of contract claim, eight for private nuisance, three for negligence, and five questions concerning damages. Only 47 special verdict forms were needed for the 72 plaintiffs because the forms addressed the claims relating to a single rental space and, in many instances, two or three plaintiffs lived together.

The jury found in favor of Joyce and Richard Avana (the Avanas) on their claim for private nuisance. Joyce Avana and her son Richard rented space 16. During closing argument, plaintiffs' attorney asserted that the sewer records showed backup after backup in the Avanas' home during 2004, 2005 and 2006. The attorney requested $40,497 in damages for overpayment of rent and $16,325 for loss of use and enjoyment. He also asserted: "To repair the home of the damage that's been done by the park is $17,143." The jury awarded $10,000 in damages for the cost of repair or replacement. No other damages were awarded.

The jury also found in favor of Erika and Alfonso Barragan (the Barragans), who rented space 61, on their claim for private nuisance. During closing argument, the attorney asserted (1) the sewer backed up into their home causing them to spend $2,500 to replace the flooring and (2) the unit did not get sufficient amperage because of problems with the electrical pedestal connected to their unit. The jury found that the Barragans suffered $16,275 in economic damages[3] and that Erika Barragan suffered $15,000 in noneconomic damages. In addition, the jury apportioned 25 percent of the fault to Erika, 25 percent to Alfonso, and 50 percent to defendants.

---

[3] The jury awarded $0 for overpayment of rent; $7,775 for loss of use and enjoyment of home, and $8,500 for cost of repair or replacement. During closing argument, plaintiffs' attorney requested $40,497 for overpayment of rent; $14,508 for loss of use and enjoyment; and $20,466 for the cost of fixing the home.

The jury found in favor of Milagro and Israel Cermeno (the Cermenos) on their negligence claim. The Cermenos rented space 75A. During closing argument, plaintiffs' attorney mentioned the problems the Cermenos had with flushing their toilet and slow drainage, though no sewage spills occurred inside their home. Counsel also mentioned problems with low water pressure and electrical service, maintenance of the laundry room, access to the fitness room, and rats infesting their home after a nearby abandoned home was demolished. The jury found the Cermenos incurred $4,200 in economic damages and Milagro Cermenos suffered $10,000 in noneconomic damages.

As to the claims of the remaining 66 plaintiffs, the jury found in favor of the defendants.[4] On December 20, 2010, the trial court filed a judgment that implemented the jury's special verdicts.

Plaintiffs then filed a timely motion for new trial or, in the alternative, for judgment notwithstanding the verdict. The motion asserted (1) instructional error regarding the elements of public nuisance; (2) inconsistent special verdicts regarding public nuisance and breach of contract; (3) inconsistency between the finding of no public nuisance and the findings of nuisance with respect to the Avanas, the Barragans and the Cermenos; and (4) insufficiency of the evidence to justify the verdict. The trial court denied plaintiffs' motion.

The trial court also decided posttrial issues concerning costs and attorney fees and implemented its decision in an amended judgment filed on February 7, 2012. As to the 66 plaintiffs who went to verdict and did not prevail, the amended judgment stated they were jointly and severally liable for $1,975,543.33 in attorney's fees and other costs. As for the two plaintiffs dismissed for nonsuit, the amended judgment stated the estates of Nancy and Walter Faughn were jointly and severally liable for approximately $1.5

---

**4** Two of the plaintiffs, the estates of Nancy Faughn and Walter Faughn, did not obtain a jury verdict because their claims were dismissed for nonsuit during the trial.

million of the fees and costs awarded. In total, the amended judgment resolved the claims of 82 plaintiffs—eight never got to trial because a terminating sanction led to their dismissal, two were nonsuited, six won at trial, and 66 lost as a result of jury verdicts against them. Further details about the amended judgment are provided in part V.E., *post*.

Only 63 of the 66 plaintiffs who lost as a result of jury verdicts have pursued this appeal. The plaintiffs who won at trial—the Avanas, the Barragans and the Cermenos—did not appeal.

## DISCUSSION

I.      CONSISTENCY OF SPECIAL VERDICTS*

        A.      Basic Principles of Law Governing Inconsistent Verdicts

Pursuant to subdivision 6 of Code of Civil Procedure section 657, a new trial may be granted if the verdict "is against law." Inconsistent verdicts are "against law" for purposes of the statute and, therefore, constitute proper grounds for a new trial. (*Morris v. McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 970.) An appellate court may not avoid the need for a new trial by choosing which of the inconsistent answers in the special verdicts to implement. (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358.)

The consistency of special verdicts is analyzed as a matter of law. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678.) Therefore, we will conduct an independent review of the jury's answers to the questions in the special verdicts. (*Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1500 [special verdict's correctness subject to de novo review].) When conducting this independent review, we do not infer findings and do not indulge any presumption in

---

\*       See footnote, *ante,* page 1.

favor of upholding the special verdicts. (*Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 542.) Nevertheless, inconsistency is established only when there is no possibility of reconciling the answers in the special verdicts with each other. (*Singh v. Southland Stone, U.S.A., Inc.*, *supra*, 186 Cal.App.4th at p. 357.)

B.      Contents of the Special Verdicts

Plaintiffs' claim of inconsistency involves the jury's answer to the first question in the special verdict for public nuisance and the answers to a breach of contract question in the 44 special verdicts for the claims of the individual plaintiffs who appealed. Our analysis of the asserted inconsistency is not limited to those answers because the jury's other findings might help explain or reconcile the answers that plaintiffs contend are inconsistent.

### 1.      Questions and Answers Concerning Public Nuisance

The jury answered "Yes" to the first question in the special verdict form for public nuisance. It asked whether there was "a substantial failure by Colony Park to provide and maintain the physical improvements of the Park and the common facilities in good working order and condition." The jury answered "No" to the second question, which asked if there was a substantial violation by Colony Park of the Park's rules. These two answers establish that the jury found one or more substantial failures to maintain the physical improvements and/or the common facilities in good working order and condition, but did not find a substantial violation of the Park's rules and regulations.

Next, the jury answered "Yes" to the third question in the special verdict form for public nuisance. That question asked whether the substantial failure was of such a nature, duration, or amount as to be injurious to health, or offensive to senses, or an obstruction to the free use of property so as to interfere with the comfortable enjoyment of life or property.

The jury proceeded to the fourth question and answered "No" to whether the substantial failure affected a substantial number of people at the same time. As directed in the special verdict, the jury did not answer the last three questions of the special verdict for public nuisance. Those questions addressed whether an ordinary person would have been reasonably annoyed or disturbed by the substantial failure, whether the substantial failure caused harm, and whether there was a current failure to maintain certain of the physical facilities at the Park.[5]

In summary, the answers provided in the special verdict for public nuisance establish that the jury found there were one or more substantial failures to maintain the Park's physical improvements and/or the common facilities in good working order and condition, but that the failure or failures did not affect a substantial number of people at the same time.

### 2.    *Question and Answer Regarding Breach of Contract*

Forty-four special verdict forms were submitted to the jury for each plaintiff or plaintiffs for three individual causes of action: breach of contract, private nuisance, and negligence. Question No. 1 asked whether the defendants had breached their contract with a particular plaintiff or plaintiffs. For example, the "Special Verdict for Plaintiff Linda Adams [Space 135]," (some capitalization omitted) asked: "Did the Defendants breach their contract with Plaintiff LINDA ADAMS?" The jury answered "No" to this question and the first breach of contract question in the other 43 special verdict forms.

Plaintiffs argue that the jury's finding, contained in question No. 1 of the special verdict for public nuisance, that there was a substantial failure to maintain the Park's physical improvements and/or the common facilities in good working order and condition, should have lead the jury to find a breach of contract occurred.

---

[5]    The physical facilities listed in the special verdict form were the sewer system, water pressure, electrical service, vacant spaces and security.

### 3. Questions and Answers Regarding Private Nuisance

Question No. 4 in the special verdict for the claims of Linda Adams addressed the existence of a private nuisance by asking: "As to Plaintiff LINDA ADAMS, was there a substantial failure by Defendants to provide and maintain the physical improvements of the Park and the common facilities in good working order and condition?" The other 43 special verdict forms for the individual claims contained the same question, tailored to the particular plaintiff or plaintiffs.

On the three special verdict forms for the successful plaintiffs,[6] the jury answered this question "Yes." On the special verdict forms for the plaintiffs pursuing this appeal, the jury answered "No."

These answers to questions about private nuisance mean that the jury found there was a substantial failure to maintain physical improvements or common facilities in good working order as to only three sets of plaintiffs and no such failure existed as to the plaintiffs that are pursuing this appeal. The jury's findings regarding *private nuisance* explain why the jury answered "No" to the question in the special verdict for *public nuisance* that asked whether the substantial failure affected a substantial number of people at the same time. To summarize these findings, the substantial failures affected only the six successful plaintiffs and did not affect the remaining plaintiffs.

### C. Plaintiffs' Contentions and Trial Court's Rationale

The unsuccessful plaintiffs contend that one of the alleged breaches of contract concerned the defendants' failure to maintain the Park's physical improvements and common facilities in good working order and condition. Because this theory of breach is nearly identical to the elements of public nuisance addressed in question no. 1 the first question in the special verdict for public nuisance—the only difference being that the

---

[6] The successful plaintiffs were the Avanas (space 16), the Barragans (space 61), and the Cermenos (space 75A).

11.

breach of contract claim did not require a "substantial" failure—plaintiffs contend that the jury could not rationally find a substantial failure and also find that no breach of contract occurred.

The trial court addressed this argument when it denied plaintiffs' motion for new trial. The court applied the beyond-the-possibility-of-reconciliation test and stated that it did "not find the verdicts to be inconsistent .…" The court supported its conclusion by stating:

> "The jury was properly instructed as to the elements of a breach of contract as well as defenses thereto. CACI 319 was given which provided for a defense to the alleged breach of contract that in essence states that the park owner/management was given a reasonable amount of time to address tenant complaints. This instruction was specific as to the breach of contract claim. The evidence from the defense point of view was that the defense attempted to deal with each issue or complaint in a timely fashion. Many of the residents, who also are suing for breach of contract, did not make known to the management their complaints."[7]

The trial court also found the negative findings on the breach of contract claims were supported by the evidence and could have been based on a myriad of factors.

Plaintiffs address the point that the contracts allowed a reasonable time for repairs by arguing:

> "[Defendants] presume the jury did not find a contractual failure to maintain because [defendants] always responded to problems within a reasonable time. If, however, [defendants] acted quickly enough to avoid breaching its contractual duty of mere failure-to-maintain, then how could that mere failure to maintain then ripen into a substantial failure to maintain? The answer is, it could not."

This argument is not persuasive because nothing in the record indicates the jury was instructed that a failure to maintain would be deemed insubstantial if the defendants

---

[7] The jury was instructed: "If a contract does not state a specific time which the parties are to meet the requirements of the contract, then the party must meet them within a reasonable time. What is a reasonable time depends on the facts of each case .…"

12.

cured the problem within a reasonable time after being notified. Furthermore, it does not make sense to infer the jury interpreted "substantial" in the manner now put forth by plaintiffs. For example, an overflowing toilet might cause extensive damage to flooring and carpeting and thus be deemed a substantial failure of the sewer system even if the cause of the overflow is addressed promptly and the problem does not occur again.

        D.      The Special Verdicts Can Be Reconciled

We conclude that the jury's findings that the defendants did not breach their contract with any of the plaintiffs in this appeal can be reconciled with the finding that there were one or more substantial failures to maintain the Park's physical improvements or common facilities in good working order and condition.

It is reasonable to interpret the jury's answers to mean that the physical improvements that were not maintained affected only those plaintiffs who won favorable verdicts on their private nuisance claims. Thus, the failures to maintain physical improvements did not affect the unsuccessful plaintiffs and, accordingly, would not have breached any obligation to maintain physical improvements owed to those plaintiffs.

Also, it is reasonable to interpret the special verdicts addressing the successful plaintiffs' breach of contract claims to mean that the failures to maintain that affected them were addressed within a reasonable time. There is nothing in the instructions to negate the possibility that the jury found the failures affecting the Avanas, the Barragans and the Cermenos were "substantial" and also found the failures were repaired within a reasonable time.

For example, with respect to the Avanas' problem involving a sewage spill from a line next to their home, the jury could have found this event resulted from a substantial failure to maintain, but that defendants responded in a timely manner by having the tree and its roots removed the same day the spill was reported.

Therefore, plaintiffs have not established that there is no possibility of reconciling the answers in the special verdicts with each other. (*Singh v. Southland Stone, U.S.A., Inc.*, *supra*, 186 Cal.App.4th at p. 357.) Because it is possible to reconcile the special verdicts, we reject plaintiffs' argument that the special verdicts were inconsistent and a new trial is necessary.

II. JURY INSTRUCTION REGARDING CONTRACTUAL DUTY IMPLIED BY LAW*

A. Proposed Instruction

On Tuesday morning, October 19, 2010 (the day closing arguments started), counsel for plaintiffs submitted a hand-written proposed jury instruction to the trial court. The proposed instruction stated:

> "Plaintiffs' contracts with defendants contain a promise by defendants to maintain the Park's common facilities and physical improvements in good working order and condition. This promise is implied by law, whether it appears in the contract or not."

The trial court refused to give the proposed instruction and set forth on the record a number of grounds for the refusal. Among other things, the court stated that (1) it did not think the proposal was a proper instruction and (2) the proposal should have been presented to the court "a long time ago."

The trial court's refusal to give the proposed instruction could be upheld on a variety of grounds. For the sake of brevity, we will address only timeliness.

B. Requested Instruction Was Untimely

Code of Civil Procedure section 607a addresses proposed jury instructions and requires counsel, "before the first witness is sworn, to deliver to the judge presiding at the trial … all proposed instructions to the jury covering the law as disclosed by the pleadings."

---

\* See footnote, *ante,* page 1.

14.

Plaintiffs' opening brief devotes a single paragraph to the argument that the trial court erred by refusing to give the instruction. That paragraph does not address the timeliness of the request.[8] Furthermore, plaintiffs reply brief does not mention the proposed instruction at all, much less present an explanation for why the request was timely.

Plaintiffs' failure to address the timeliness issue in their appellate briefing leads us to conclude that they have failed to carry their burden of demonstrating that the trial court erred when it determined the proposed instruction should have been presented "a long time ago." (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [appellant must affirmatively demonstrate error].) Furthermore, case law indicates that a trial court does not abuse its discretion when it refuses to give an instruction offered the morning that final jury arguments are to commence. (*Wilson v. Gilbert* (1972) 25 Cal.App.3d 607, 613.)

Therefore, we will uphold the trial court's refusal of the proposed instruction concerning an implied-by-law contractual duty.

III.     JURY INSTRUCTIONS REGARDING PUBLIC NUISANCE

A.     Rules of Law Concerning Public Nuisance

1.     *Common Law Public Nuisance*

In 1872, the California Legislature codified a number of common law principles regarding nuisance. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1104.) The Legislature defined a nuisance in Civil Code section 3479 as anything that is "injurious to

---

[8]     The point was not raised "under a separate heading or subheading summarizing the point," which violated the requirements of California Rules of Court, rule 8.204(a)(1)(B). This violation is one of the other grounds for rejecting plaintiffs' claim of trial court error regarding the implied promise instruction. (*Akins v. State of California* (1998) 61 Cal.App.4th 1, 17, fn. 9 [appellate courts may disregard arguments that do not comply with the rule].)

health, ... or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway ….” A nuisance qualifies as a *public nuisance* when it “affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.” (Civ. Code, § 3480.) The concept of a private nuisance includes all those nuisances not covered by the definition of public nuisance (Civ. Code, § 3481) and also includes some public nuisances. (47 Cal.Jur.3d (2010) Nuisances, § 27 p. 303 [nuisance may be both public and private under certain circumstances].) In other words, it is possible for a nuisance to be public and, from the perspective of individuals who suffer an interference with their use and enjoyment of land, to be private as well. (*Friends of H Street v. City of Sacramento* (1993) 20 Cal.App.4th 152, 160.)

A private nuisance cause of action requires the plaintiff to prove an injury specifically referable to the use and enjoyment of his or her land. (*Monks v. City of Rancho Palos Verdes* (2008) 167 Cal.App.4th 263, 302 (*Monks*).)

The remedies for a public nuisance are (1) indictment or information (i.e., a criminal proceeding); (2) a civil action; or (3) abatement. (Civ. Code, § 3491.) In contrast, the remedies for a private nuisance are limited to a civil action or abatement. (Civ. Code, § 3501.)

>    2.    *Public Nuisance under the Mobilehome Residency Law*

In 1982, the Legislature enacted Civil Code section 798.87. (Stats. 1982, ch. 1392, § 2, p. 5306.) The current version provides:

> “(a) The substantial failure of the management to provide and maintain physical improvements in the common facilities in good working order and

condition shall be deemed a public nuisance. Notwithstanding Section 3491, this nuisance may only be remedied by a civil action or abatement.

"(b) The substantial violation of a mobilehome park rule shall be deemed a public nuisance. Notwithstanding Section 3491, this nuisance may only be remedied by a civil action or abatement."[9]

The foregoing failures and violations, despite being deemed public nuisances, may be remedied only by a civil action or abatement. (Civ. Code, § 798.87, subds. (a) & (b).) Thus, unlike common law public nuisances, they may not be remedied in criminal proceedings. Subdivision (c) of Civil Code section 798.87 states that a civil action under this section may be brought by a park resident, park management, or a district or city attorney.

The Legislative Counsel's Digest described the statute as providing "that both the failure of the management of a mobilehome park to provide and maintain physical improvements in the common facilities in good working order and condition and the violation of a mobilehome park rule *are nuisances as specified*." (Legis. Counsel's Dig., Assem. Bill No. 1324 (1981-1982 Reg. Sess.) 6 Stats. 1982, Summary Dig., p. 504, italics added.)

B.    Contents of the Parties

Plaintiffs' FAC alleged that "defendants created and maintained both a private and a public nuisance at common law and under Civil Code section 798.87." Plaintiffs asserted they presented a revised set of proposed instructions that included a proposed instruction defining a public nuisance in two separate ways—the first based on the statutory criteria of Civil Code section 798.87 and the second based on the common law elements codified in Civil Code section 3479. Plaintiffs contend that the trial court

_____

[9]    A 1983 amendment added the word "substantial" to subdivisions (a) and (b). (Stats. 1983, ch. 187, § 1.) Proponents of this amendment asserted it would prevent the use of the new law for the smallest of infractions and would discourage frivolous lawsuits.

17.

erroneously instructed the jury on the law of public nuisance by conflating the two theories into a single instruction and special verdict form. In plaintiffs' view, the jury should have been allowed to find a statutory public nuisance existed based solely on the criteria in Civil Code section 798.87, which was drafted specifically to address situations arising in mobilehome parks, and should not have been required to find additional elements pertaining to a common law public nuisance.[10]

Defendants counter plaintiffs' contention by asserting that (1) plaintiffs agreed to the public nuisance instruction and, thus, their challenge is barred by the doctrine of invited error or waiver; (2) the public nuisance instructions were correct; and (3) the instructional error, if any, was harmless.

C.     Instructional Error

Based on the mandatory language in Civil Code section 798.87—"shall be deemed a public nuisance"—and the legislative history, which includes the summary in the Legislative Counsel's Digest that refers to "nuisances as specified," we conclude that the substantial failure to maintain described in subdivision (a) of Civil Code section 798.87 and the substantial violation of park rules described in subdivision (b) constitute public nuisances that can be proven without the need to show the additional elements of a common law public nuisance.

A contrary reading of the statute would mean that the Legislature did not expand the existing remedies available to park residents, but actually narrowed available remedies, as the newly described public nuisances may not be addressed in criminal proceedings. Nothing in the legislative history presented to this court indicates that the

---

**10**     Under this theory of error, plaintiffs assert that the jury should not have been asked the fourth or fifth questions in the special verdict for public nuisance. The fourth question asked whether the substantial failure to provide and maintain improvements and facilities "affect[ed] a substantial number of people at the same time." The jury answered that question "No," and did not reach the fifth question.

18.

Legislature thought the common law formulation of public nuisance was too broad when applied to mobilehome parks and, therefore, needed to be restricted. To the contrary, the legislative history indicates that the existing rules regarding public nuisance were not adequate and special rules were needed to address problems peculiar to mobilehome parks.

Therefore, we agree with plaintiffs that the instructions and the special verdict form for public nuisance contained legal error in that they added elements of a common law public nuisance to the two types of public nuisance created by subdivisions (a) and (b) of Civil Code section 798.87.

In addition, the instructions and verdict form contained an additional misstatement of law because they did not track the language in subdivision (a) of Civil Code section 798.87, which refers to "substantial failure of the management to provide and maintain physical improvements **in** the common facilities in good working order and condition." (Boldface added.) Because of the limiting effect of the prepositional phrase "in the common facilities," the statutory provision does not extend to physical improvements that are not part of the "common facilities."

In comparison, the instructions and verdict forms referred to "a substantial failure by Colony Park to provide and maintain the physical improvements of the Park **and** the common facilities in good working order and condition." (Boldface added.) By changing the statute's "in" to the word "and," the trial court expanded the statutory language so that the instructions included all physical improvements, whether or not they were "in common facilities."

Plaintiffs did not raise this second instructional error in their papers and, at oral argument, confirmed that they were not pursuing it. We have described the failure to track the statutory language here because that error affects how the jury's answers in the special verdicts are interpreted. Specifically, if the correct wording had been used, then the jury's answers to the question in the special verdict for public nuisance about

19.

substantial failures to maintain would have indicated a problem that involved the common facilities. Instead, the jury's "yes" answer to that question may have been based on failures to maintain physical improvements on particular lots that had no impact on any common facility.

      D.      Demonstrating Prejudice from Instructional Error

Not all instructional errors require reversal and a new trial. To obtain a reversal, an appellant must establish that the error was prejudicial.

      *1.      Rules of Law Governing Appellate Inquiry into Prejudice*

Article VI, section 13 of the California Constitution provides that "[n]o judgment shall be set aside, or a new trial granted, in any cause, on the ground of misdirection of the jury … unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."[11]

The California Supreme Court has interpreted the "miscarriage of justice" phrase as prohibiting a reversal unless there is "a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) Thus, when challenging the jury instructions given in a civil case, the appellant must show it was "reasonably probable the jury would have returned a more favorable verdict." (*Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1073.)

---

[11]    This constitutional provision has a statutory parallel: "No judgment … shall be reversed … by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error … or defect had not occurred or existed." (Code Civ. Proc., § 475.)

The California Supreme Court also has provided guidance for applying the constitutional requirement for "an examination of the entire cause" (Cal. Const., art. VI, § 13) when assessing prejudice from instructional error. Insofar as relevant, courts should consider (1) the degree of conflict in the evidence on the critical issues; (2) whether the winning side's argument to the jury may have contributed to the instruction's misleading effect; (3) whether the jury requested rereading of the erroneous instruction or related evidence; (4) the closeness of the jury's verdict; and (5) the effect of other instructions in remedying the error. (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at pp. 570-571.) Stated more succinctly, the assessment "requires evaluation of several factors, including the evidence, counsel's argument, the effect of other instructions, and any indication by the jury itself that it was misled." (*Id.* at p. 574.)

An appellate court's responsibility to conduct "an examination of the entire cause" (Cal. Const., art. VI, § 13) is triggered "when and only when the appellant has fulfilled his duty to tender a proper prejudice argument. Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) These principles are derived from the axiom that prejudice is not presumed and the burden is on the appealing party to demonstrate that prejudice has occurred. (*Id.* at p. 105.)

### 2.     *Argument Regarding Prejudice*

In their opening brief, plaintiffs simply argued that they "clearly were prejudiced by this error" in the instructions regarding public nuisance. By relying on this conclusory assertion of prejudice, plaintiffs (1) failed to articulate the more favorable result that they believe would have been achieved in the absence of the instructional error and (2) failed to analyze the factors (i.e., the evidence, counsel's argument, the other instructions and

special verdicts) that are used to assess whether that more favorable result was a reasonably probability.

Therefore, plaintiffs' opening brief failed to carry their burden of affirmatively demonstrating the existence of a *prejudicial* error. (See *Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 403 ["fundamental rule of appellate review is that the appellant must affirmatively show *prejudicial* error"].)

Defendants' opposition brief raised the question of prejudice by contending that plaintiffs would have lost even if the purported instructional error did not exist. Plaintiffs' reply brief responded with the following argument:

> "[Defendants] overlook the fact that there was substantial evidence in the record to support a verdict in favor of [Plaintiffs]. Indeed, the jury did find in the special verdict that [Defendants] had substantially failed to maintain the Park in good working order and condition. They found a nuisance per se under Civil Code section 798.87. [Plaintiffs] could have used that verdict to seek injunctive repairs. The jury could have used that verdict to find a private nuisance and award damages."[12]

This argument at least addresses the starting point of a prejudice analysis by identifying the more favorable results that plaintiffs believe they would have achieved in the absence of the alleged instructional error. First, plaintiffs assert they had a reasonable probability of obtaining an injunction requiring repairs. Second, plaintiffs assert they would have been able to obtain damages.

---

[12]     Generally, appellate courts will consider an argument raised for the first time in a reply brief only if the appellant presents a good reason for failing to present the argument earlier. (*Lister v. Bowen* (2013) 215 Cal.App.4th 319, 336-337.) Here, plaintiffs have not presented a good reason for failing to analyze prejudice in their opening brief. This failure represents a separate and independent ground for our rejection of their claim that the instruction on the elements of a public nuisance constituted reversible error.

### 3. *Possibility of Injunctive Relief*

Here, the jury found that (1) regarding the claim of a public nuisance, the substantial failure or failures to maintain did not affect a substantial number of people at the same time; (2) regarding the private nuisance claims of each of the unsuccessful plaintiffs, there was no substantial failure by defendants to provide and maintain physical improvements or common facilities in good working order and condition; and (3) a substantial failure to maintain occurred only as to the Avanas, the Barragans and the Cermenos—the successful plaintiffs who rented spaces 16, 61 and 75, respectively. As to the Cermenos, the jury found that the substantial failure to maintain did not cause them harm. Thus, the Cermenos did not prevail on their private nuisance theory, but prevailed on their negligence claim.

These explicit findings by the jury lead us to conclude that the substantial failures to maintain physical improvements or common facilities in good working order and condition that were the basis of the jury's answer to the first question in the special verdict on public nuisance affected only the Avanas and the Barragans and *did not affect any of the plaintiffs pursuing this appeal*.

Defendants' opposition brief identifies the problems experienced by the Avanas and the Barragans and argues that there is no abatement necessary or possible. Defendants assert (1) the Avanas' problem involved a spill from a sewer line next to their home caused by tree roots, and (2) the tree was removed the same day the spill occurred, and (3) the Avanas experienced no further spills. As to the Barragans, defendants assert they had a problem with their electrical pedestal and this problem did not affect the other tenants.

Despite defendants' specific discussion of the failures to maintain that resulted in liability to the successful plaintiffs and how these failures fit into the jury's other findings, plaintiffs' reply brief made no attempt to present an example of a failure to

maintain that (1) also fit with the jury's findings and (2) could have been remedied by an injunction ordering repairs. In effect, plaintiffs have relied on the theoretical possibility of injunctive relief without demonstrating it was a reasonable possibility. This is not simply an oversight by plaintiffs' attorneys. Because the jury explicitly found that there were no substantial failures to maintain as to each unsuccessful plaintiff, none of those plaintiffs need an injunction to alleviate the impact of substantial failure to maintain on them. In short, the substantial failures to maintain involved only the successful plaintiffs and not any of the plaintiffs pursuing this appeal.

Accordingly, based on our examination of the jury findings and the evidence presented, we conclude the plaintiffs have not demonstrated prejudice by showing a reasonable probability that they could have obtained an injunction ordering defendants to repair a public nuisance.[13]

### 4. Possibility of Recovering Damages Caused by a Public Nuisance

Plaintiffs also argue the instructional error regarding public nuisance prejudiced them because the jury could have used the "yes" answers in the verdict regarding public nuisance to find a private nuisance and award damages.

We reject this argument regarding prejudice because the answers in the verdict forms regarding public nuisance and private nuisance establish that the unsuccessful plaintiffs were not affected by, and thus could not have experienced any damages from, a substantial failure to maintain.

The special verdict forms dealing with the *private* nuisance claims required the jury to address specifically whether, as to the individual plaintiffs, there was a substantial failure by defendants to provide and maintain the physical improvements of the Park and

---

[13] Because of our conclusion that plaintiffs have not met their burden to show prejudicial error, we need not address the contention that plaintiffs agreed to the public nuisance instruction and, thus, their challenge is barred by the doctrine of invited error or waiver.

24.

the common facilities in good working order and condition. The jury found such failures only with respect to the successful plaintiffs. As to the unsuccessful plaintiffs, the jury found no such failures.

The findings that there were no substantial failures to maintain as to the unsuccessful plaintiffs clearly means that the substantial failures to maintain, that caused the jury to answer "yes" to the first question in the special verdict for public nuisance, affected only the successful plaintiffs and did not affect the plaintiffs who lost at trial. It logically follows that the finding of substantial failures to maintain in the special verdict for public nuisance could not have been used by the unsuccessful plaintiffs to obtain damages.

Stated from another perspective, the answers to the questions in the special verdict forms regarding private nuisance provide this court with sufficient information to conclude that the unsuccessful plaintiffs were not affected or damaged by defendants' substantial failure to provide and maintain the physical improvements of the Park and the common facilities in good working order and condition. Indeed, as plaintiffs' counsel pointed out during his closing arguments to the jury, the purpose of the special verdicts regarding private nuisance was to individualize the harm from the substantial failures found in the answers regarding a public nuisance. This purpose was achieved when the jury found that four of the plaintiffs were damaged under a private nuisance theory and the unsuccessful plaintiffs were not affected by a substantial failure to maintain.

Therefore, the jury would not have awarded monetary damages to the unsuccessful plaintiffs if the jury had been instructed properly on public nuisance under Civil Code section 798.87, subdivision (a). Accordingly, plaintiffs have not established that the instructional error caused prejudice.

25.

## IV. JURY INSTRUCTIONS REGARDING PRIVATE NUISANCE[*]

### A. Contentions of the Parties

Plaintiffs contend that the trial court erred by instructing the jury on private nuisance by requiring proof of both a per se public nuisance under Civil Code section 798.87, subdivision (a) and elements of a common law nuisance under Civil Code section 3479. In particular, plaintiffs argue:

> "Given the jury's finding in the Special Verdict on Public Nuisance that there was a *per se* public nuisance under Civil Code section 798.87[, subdivision] (a), the jury should simply have been instructed that such a nuisance was a private nuisance if it caused [plaintiffs] damage."[14]

---

[*] See footnote, *ante,* page 1.

[14] Plaintiffs' reply brief asserts that their "theory was that the public nuisance under [Civil Code] section 798.87 was also a private nuisance because it caused [plaintiffs] special injury." We have reviewed the legislative history presented by plaintiffs and found nothing that states or implies the Legislature intended the matters "deemed" to be a "public nuisance" in subdivisions (a) and (b) of Civil Code section 798.87 should also be treated as "private nuisances" if a resident could prove an injury specifically referable to the use and enjoyment of his or her land. (See *Monks*, *supra*, 167 Cal.App.4th at p. 302 [type of injury required for private nuisance].) Furthermore, such an expansive reading of the statutory language is not necessary to promote the purpose of the statute, which was to provide a quick and efficient remedy to residents.

Furthermore, other statutory provisions show that the Legislature refers to a "nuisance," "whether public or private" when it intends a statute to cover both types of nuisance. (E.g., Bus. & Prof. Code, § 17800 [building used for counterfeiting]; Pen. Code, § 186.22a [buildings used by street gangs]; Pen. Code, § 11200 [building used for unlawful liquor sales].) Furthermore, the Legislature has chosen to define certain situations as constituting only a private nuisance. (Civ. Code, § 841.4 [spite fences]; Pub. Resources Code, § 25983 [brush interfering with solar collector].) These other statutes make it difficult to read the language in Civil Code section 798.87 as implying that a specified failure to maintain or a substantial violation of park rules also is deemed a private nuisance when a plaintiff suffers the requisite injury. Therefore, we reject plaintiffs' argument that a public nuisance under Civil Code section 798.87 plus a special injury constitutes a private nuisance per se.

In particular, plaintiffs contend the trial court erroneously required the jury to find (1) the private nuisance constituted an unreasonable interference with the use and enjoyment of the individual plaintiff's property and (2) an ordinary person would have been reasonably annoyed or disturbed by the nuisance.

Defendants respond to the claim of instructional error regarding private nuisance by asserting that (1) plaintiffs invited the purported error, (2) the jury's findings rejecting the negligence claim bars the private nuisance claims as a matter of law, and (3) the plaintiffs are mistaken about the elements of a claim for private nuisance.

B.      Special Verdict Forms for Public and Private Nuisance

As previously stated, the special verdict for *public* nuisance contained seven questions, the first of which originates from Civil Code section 798.87, subdivision (a), and asked:

> "Was there a substantial failure by Colony Park to provide and maintain the physical improvements of the Park and the common facilities in good working order and condition?"

By comparison, each of the 47 special verdicts for the individual causes of action of the plaintiffs included a set of 19 questions, eight of which addressed the private nuisance claim. To illustrate, the initial question concerning plaintiff Linda Adams' private nuisance claim, which again originated under Civil Code section 798.87, subdivision (a), asked:

> "As to Plaintiff LINDA ADAMS, was there a substantial failure by Defendants to provide and maintain the physical improvements of the Park and the common facilities in good working order and condition?"

The same question was asked for the other plaintiffs. The only difference of substance between the first question concerning public nuisance and the first question

27.

regarding private nuisance are that the private nuisance questions referred to each plaintiff in the lead-in, which began: "As to Plaintiff …."[15]

The jury answered "Yes" to the first question in the special verdict for public nuisance, but answered "No" to the initial question concerning private nuisance for each of the unsuccessful plaintiffs. The six plaintiffs for whom the jury answered "Yes" to the initial question concerning private nuisance are not parties to this appeal.

As a result of the "No" answers to the initial question concerning private nuisance under subdivision (a) of Civil Code section 798.87, the jury never answered the questions in the special verdict form regarding the questions about the common law elements for a private nuisance that plaintiffs contend were erroneously included in the instructions.

Consequently, we conclude that plaintiffs have not demonstrated the inclusion of those elements caused any prejudice to the plaintiffs. Those elements concerned whether (1) the alleged nuisance constituted an unreasonable interference with the use and enjoyment of the individual plaintiff's property and (2) an ordinary person would have been reasonably annoyed or disturbed by the alleged nuisance.

Because the jury never reached the questions asking whether the plaintiffs had proved these elements, it logically follows that including the elements caused no harm to the plaintiffs. Stated otherwise, if the erroneous elements had been eliminated from the special verdict forms, the outcome would have been the same. The jury still would have rejected the private nuisance claims of the plaintiffs pursuing this appeal.

V.     RECREATIONAL VEHICLES AND THE PARK'S RULES AND REGULATIONS

Plaintiffs contend the trial court committed reversible error in an evidentiary ruling and a jury instruction by misinterpreting the Park's rules to mean Colony Park was

---

[15]     The other difference in wording did not affect meaning. The question regarding private nuisance used "Defendants" in place of "Colony Park."

allowed to rent spaces for recreational vehicles.  In plaintiffs' view, the Park's rules prohibited Colony Park from renting spaces for recreational vehicles.  This claim of error requires us to determine whether the Park's rules are ambiguous (i.e., reasonably susceptible to more than one interpretation) on the subject of Colony Park's authority to rent spaces for recreational vehicles.  (See *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [the existence of contractual ambiguity is a threshold question to the determination of meaning].)[16]

      A.     <u>Meaning of the Park's Rules</u>

      *1.     Contents of the Park's Rules and Regulations*

The controversy regarding the interpretation of the Park's rules involves provisions in the sections labeled "PARK STANDARDS" and "VEHICLES."[17]  The park standards stated:

> "Only mobile homes approved by the Management/Park owner shall be admitted into the Park.  Management reserves the right to refuse admission to any mobile home which does not meet park standards, the condition and/or appearance of which is misrepresented or which is not compatible with homes in the park, determined in terms of their size, dimensions, material, quality and condition."

Subsequent standards addressed maintenance of the "[e]xterior[] of mobile homes" and the installation of management-approved skirting.  None of the standards mentioned recreational vehicles or motor homes.

---

[16]    The Park began its operations in the 1970's and, therefore, the restrictions on renting spaces for the accommodation of recreational vehicles that are set forth in Civil Code section 798.22 do not apply in this case.  Those restrictions apply to mobilehome parks developed after January 1, 1982.

[17]    The Park's rules and regulations were labeled "GUIDELINES TO LIVE BY" and included "PARK STANDARDS" as section IV.A and "VEHICLES" as section V.

Motor homes and recreational vehicles were addressed later in section V.2.c of the Park's rules and regulations concerning vehicles:

"Campers[,] motor homes[,] recreational vehicles, trailers, boats, etc[.] may not be stored or maintained on lots or driveways[.] Unless space is available in the Park provided storage area[,] Tenant must arrange for storage outside of the Park[.] Vehicles, whether in the storage area or parked at a space may not be used for sleeping[.] Recreational vehicles may be loaded/unloaded at the mobile home space for a period of 2 days before or after a trip."

### 2. *Trial Court's Interpretation*

During plaintiffs' case-in-chief, the trial court considered the meaning of the foregoing provisions of the Park's rules and specifically addressed the argument of plaintiff's attorney that "only mobile homes" meant nothing else was allowed to be moved into the Park. The court stated: "That only says what mobilehomes are going to be approved by the park. It doesn't say, therefore, there can't be any RVs." The court further explained its interpretation of the Park's rules by stating:

"There's nothing that precludes the park in these contracts from renting to RVs. The language is specific as to what mobilehomes they're going to accept or reject into the park, which is consistent with what a mobilehome park would do. There's nothing in here talking about anything about being able to or not able to rent to RVs. It's very clear they can rent to RVs because there's things about for RV storage and what have you that's also contained in the park's rules and regulations."

This statement demonstrates that the trial court decided the Park's rules were not ambiguous. When the trial court reached this conclusion about ambiguity, the only parol evidence before it was the testimony of a few plaintiffs that the Park manager told them that Colony Park would not rent spaces for recreational vehicles. Defendants prevailed on the issue without presenting any parol evidence to support their interpretation.

### 3. *Appellate Review of Ambiguity and Parol Evidence*

The standard analysis used to review a trial court's interpretation of a written contract is set forth in *Winet v. Price*, *supra*, 4 Cal.App.4th 1159 and begins with the

threshold question of whether the writing is ambiguous—that is, reasonably susceptible to more than one interpretation. (*Id*. at pp. 1165-1166; see *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 754-755.) The inquiry into ambiguity presents a question of law subject to independent review on appeal. (*Id*. at p. 1165.)

The analysis of whether an ambiguity exists is not limited to the words of the contract. (*Scheenstra v. California Dairies, Inc.*, *supra*, 213 Cal.App.4th at p. 390.) Trial courts are required to receive provisionally any proffered parol evidence that is relevant[18] to show whether the contractual language is reasonably susceptible to a particular meaning. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39-40; *Winet v. Price*, *supra*, 4 Cal.App.4th at p. 1165.) Such parol evidence might expose a latent ambiguity when the contract appears unambiguous on its face. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.*, *supra*, at p. 40 & fn. 8.)

Similarly, an appellate court must consider the proffered parol evidence when conducting its independent review into whether an ambiguity exists. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.*, *supra*, 69 Cal.2d at p. 40 & fn. 8.) In other words, appellate courts evaluate the instrument's language and relevant extrinsic evidence and decide whether, in light of the extrinsic evidence, the language is reasonably susceptible to the competing interpretations urged by the parties. (*Ibid*.)

### 4. *"Only Mobile Homes" Rule*

One sentence in the Park's rules provides: "Only mobile homes approved by the Management/Park owner shall be admitted into the Park." This rule identifies a single type of structure (i.e., "mobile homes approved by the Management/Park owner") that "shall be admitted into the Park." This sentence was drafted as an *authorization*; the

---

**18** Evidence is relevant if it concerns a party's outward manifestation or expression of intent. (*Winet v. Price*, *supra*, 4 Cal.App.4th at pp. 1165-1166.) "[E]vidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language." (*Id*. at p. 1166, fn. 3.)

Park's rules do not address the "admission" question from the opposite perspective and list the types of structures and vehicles that are *prohibited* from specifically renting a space or being "admitted" into the Park.

We will consider whether it is reasonable to interpret this "only mobile homes" rule as prohibiting the rental of lots to persons intending to live in recreational vehicles, which are not mentioned. This inquiry requires us to consider the meaning of the word "only" and the verb phrase "shall be admitted."

Generally, contractual language is read in its "ordinary and popular sense." (Civ. Code, § 1644.) The ordinary or common meaning of a word often is obtained by courts from dictionary definitions. (E.g., *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253, 1263 [courts typically look to dictionaries to determine a word's common meaning].)

Black's Law Dictionary (5th ed. 1979) defines "only" as "[s]olely; merely; … of or by itself; without anything more; exclusive; nothing else or more." (*Id.* at p. 982.) Another dictionary defines the word "only" to mean "without companions or associates" and "alone in an indicated … category." (Webster's 3d New Internat. Dict. (1993) p. 1577, col. 1.) Its synonyms include lone, isolated, sole and single. (*Ibid.*) Based on these dictionary definitions, the word "only" is not ambiguous. When a contract says "only A," it means "A and nothing else." The phrase "only A" cannot be construed reasonably to mean "A, B or C." (See *Debary Real Estate Holdings, LLC v. State, Dept. of Business and Professional Regulation, Division of Pari-Mutuel Wagering* (Fla.App. 2013) 112 So.3d 157, 166 [statute's use of "only two" means two and not one, three or more]; *Moore v. Stevens* (Fla. 1925) 106 So. 901 [requirement that the property "be used for residence purposes only" necessarily excluded all uses of the property that were not residential; a specific prohibition was unnecessary]; *United Parcel Service, Inc. v. Universal Diamond Corp., Inc.* (Ga.App. 1991) 409 S.E.2d 558 [no ambiguity in the contractual requirement for "cash only" payment].) Thus, the meaning of the word

"only" is clear and explicit.  (See Civ. Code, § 1638 [clear and explicit meaning governs interpretation of contract].)  We recognize, however, that the use of "only" may render a sentence ambiguous because of uncertainty as to which words or phrases are modified.  (See Haggard, *"Only," The Lonely* (1994) 5 S.C. Lawyer 25 [careless placement of "only" can alter the meaning of a sentence].)

When referring to a place (i.e., a physical location), the word "admit" usually means "to allow entry."  (Webster's 3d New Internat. Dict. (1993) p. 28, col. 2.)

Therefore, inserting the ordinary meaning of "only" and "admitted," the sentence referring to mobile homes approved by management would mean that only mobilehomes approved by the Park's management, and nothing else, shall be allowed entry into the Park.  This meaning is not a reasonable interpretation because, taken literally, it would prohibit *everything* else (including human beings, cars and pets) from being allowed to enter into the Park.  Such an interpretation is unreasonable and absurd because the clear purpose of the Park is to provide its tenants with a place to live.  Consequently, our inquiry does not end with the provision regarding park standards.  We must consider other provisions in the Park's rules and regulations before deciding if management is unambiguously authorized or prohibited from renting spaces for recreational vehicles.  (See Civ. Code, § 1641 [contract must be read as a whole and, if reasonably practicable, each clause helping to interpret the other].)

### 5.     *Provisions Addressing Recreational Vehicles*

Section V.2.c of the Park's rules indicates that recreational vehicles are allowed inside the Park if certain restrictions are followed.  One of the broader restrictions states that campers, motor homes and recreational vehicles "may not be stored or maintained on lots or driveways."

Colony Park's petition for rehearing argues that the stored-or-maintained provision is ambiguous because the term "maintained" has many definitions.  Colony

33.

Park argues the term "maintained" refers to repair work and, therefore, the proper interpretation of the rule is that recreational vehicles may not be *stored or repaired* on lots or driveways. Under this interpretation, Colony Park would not be prevented from renting spaces for recreational vehicles. Colony Park also acknowledges that the rule could be read to mean that recreational vehicles are not be *stored or kept* on lots or driveways. Based on these two possible ways to read the rule's use of the word "maintained," Colony Park contends the rule is ambiguous and the ambiguity should be resolved on remand.

In *People ex rel. Dept. Pub. Wks. v. Ryan Outdoor Advertising, Inc.* (1974) 39 Cal.App.3d 804, the court referenced dictionary definitions of the verb "'maintain'" that included "'to keep or keep up'" and "'to keep in a certain condition or position, [especially] of efficiency, good repair, etc.'" (*Id*. at p. 810.) Therefore, from an academic or abstract point of view, defendants have shown that the word "maintained" is susceptible to more than one reasonable interpretation. It could have a narrow meaning limited to the performance of repair work or it could mean "to keep in a certain … position," which position is identified by the Park's rule as "lots or driveways."

Our inquiry into the meaning of the Park's rules goes beyond the abstract—we must consider the language in context and determine if defendants have proposed a reasonable interpretation of the Park's rules. (See *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [instrument's language cannot be found to be ambiguous in the abstract; it must be construed in context]; Civ. Code, § 1641 [whole of a contract is to be taken together].)

In resolving the threshold legal question about whether the stored-or-maintained provision is ambiguous, we must determine whether the provision is reasonably susceptible to the interpretation presented in Colony Park's petition for rehearing. (See *Winet v. Price*, *supra*, 4 Cal.App.4th at p. 1165 [the existence of ambiguity is a threshold legal question].) We conclude that defendants' interpretation is not reasonable when

34.

viewed in context. Interpreting the provision to prohibit repair work would mean that someone renting a lot would be allowed to place a recreational vehicle on the lot, hook it up to the utilities, and live in the recreational vehicle, yet would not be allowed perform any repair work on the recreational vehicle. Consequently, if the recreational vehicle was damaged while on the lot, the repairs would have to be performed somewhere other than the Park to avoid violating the Park's rules as interpreted by defendants. For example, if a door was caught by the wind and its hinges bent, the door could hang askew without violating defendants' no-repair interpretation but the door could not be fixed without violating the no-repair interpretation. Another example is provided by applying defendants' no-repair interpretation to a situation where a recreational vehicle's tires went flat. The unfortunate renter, prohibited from doing any repair work on the lot, would have to drive or haul the recreational vehicle out of the Park on its rims before undertaking any repairs. These examples about how defendants' interpretation would operate lead us to conclude that defendants' interpretation of the Park's rules is not reasonable. Therefore, we conclude the only reasonable interpretation of "maintained" as used in the rule that states a recreational vehicle may not be stored or maintained on a lot or driveway is that the recreational vehicle may not be physically placed or kept in position on a lot or driveway, whether for use as living quarters, for purposes of repair, or for storage purposes.

We also note that the stored-or-maintained provision does not identify *who* is subject to the prohibition. This failure to identify who is subject to the rule does not create an ambiguity because Civil Code section 798.23, subdivision (a) provides that the park owner and its employees "shall be subject to, and comply with, all park rules and regulations, to the same extent as residents and their guests." Based on this statute,

neither the owner nor a resident would be allowed to place a recreational vehicle on a lot for use as living quarters.[19]

The critical question is whether this prohibition against maintaining recreational vehicles on a lot also operates as a *restriction on management's authority to rent lots*. In other words, does management have the authority to rent a lot to someone who intends to live on that lot in a recreational vehicle?

We conclude that the only reasonable interpretation of the Park's rules is that management is not authorized to rent lots to persons who intend to live on those lots in recreational vehicles. In short, it does not make sense to interpret the Park's rules to *allow* management to rent lots to persons who intend to live in recreational vehicles when the Park's rules prohibit the renter from using the lot for that purpose. Stated another way, the Park's rules are not reasonably susceptible to an interpretation that allows Colony Park to rent spaces for recreational vehicles.

Our conclusion that the interpretation presented by Colony Park and adopted by the trial court is not reasonable leads us to conclude that the Park's rules are not ambiguous—that is, reasonably susceptible to more than one interpretation. (See *Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1265 [language in a contract must be construed in the context of that instrument as a whole and the circumstances of the case; language cannot be found to be ambiguous in the abstract]; Civ. Code, § 1641 [whole of a contract is to be taken together].)

Our interpretation of the Park's rules is consistent with the other requirements that apply to recreational vehicles. For instance, recreational vehicles can be placed in the Park-provided storage area or storage outside the Park, but are allowed to be loaded or

---

**19** To illustrate the rule's application to the owner, it would prohibit the owner from placing a recreational vehicle on a lot and offering it as a residence to an onsite employee of the park, such as a maintenance worker or park manager.

unloaded at the mobilehome space for two days before or after a trip. Furthermore, whether in storage or parked at a space, the recreational vehicle may not be used for sleeping. These rules do not imply that management has the authority to rent spaces to a person who intends to live on the lot in a recreational vehicle.

Lastly, our interpretation of the text of the Park's rules is supported by the parol evidence presented—namely, testimony by some of the plaintiffs that management informed them that Colony Park would not rent spaces for recreational vehicles.

### 6. Summary

First, the Park's rules are not facially ambiguous on the question whether Colony Park is allowed to rent spaces for recreational vehicles. Second, the parol evidence in the record that is relevant to the interpretation of the Park's rules does not support the existence of a latent ambiguity in the Park's rules. Therefore, we conclude that when the text of the Park's rules is read as a whole in light of the relevant parol evidence received, the only reasonable interpretation of the Park's rules is that Colony Park is not authorized to rent spaces for recreational vehicles.

This interpretation, however, is not final for all purposes. Defendants did not have the opportunity to present parol evidence and, if given that opportunity, might be able to present relevant parol evidence that creates "a latent ambiguity whe[re] the contract appears unambiguous on its face." (*Scheenstra v. California Dairies, Inc.*, *supra*, 213 Cal.App.4th at p. 390.) Consequently, defendants shall be given that opportunity on remand. (See pt. V.E, *post*.)

### B. Prejudice Resulting from Erroneous Interpretation[*]

The trial court's erroneous interpretation of the Park's rules caused it to sustain defendants' evidentiary objection to testimony offered by plaintiffs that the Park manager

---

[*] See footnote, *ante,* page 1.

told them when they moved in that the Park would not rent spaces for recreational vehicles. In addition, the trial court's erroneous interpretation caused it to give the following erroneous instruction to the jury: "Now, it is not a breach of the leases or contracts for the defendant to rent spaces in Colony Park to recreational vehicles, RVs."

### 1. Relationship between Rental Agreements and Park's Rules

Defendants argue that any evidentiary or instructional error was harmless because "the court permitted [plaintiffs] to offer evidence of complaints about RVs, and the jury found no breach of the rules."

This argument requires us to determine the significance of the jury's finding that, as to each unsuccessful plaintiff , there was no substantial violation of the Park's rules by Colony Park. To make this determination, we must examine the relationship between the plaintiffs' rental agreements and the Park's rules.

Civil Code section 798.15 addresses this relationship by stating that the "rental agreement shall be in writing and shall contain, in addition to the provisions otherwise required by law to be included, all of the following: [¶] … [¶] (b) The rules and regulations of the park."

Defendants argue that this requirement simply means that a copy of the Park's rules should be attached to the lease and does not mean that the rules and regulations are incorporated into the terms of the contract. We disagree with this statutory interpretation. The language "shall contain" and the phrase "in addition to the provisions otherwise required to be included" clearly indicate that the rules and regulations are contained in— that is, are part of the provisions of—the rental agreement.

Moreover, the rental agreements used by Colony Park explicitly incorporated the Park's rules and regulations into the agreement. For example, paragraph 14 of the rental agreement marked as plaintiffs' exhibit No. 1068 stated that both the Park's rules and

regulations and the Mobilehome Residency Law, Civil Code section 798 et seq., were "incorporated herein by this reference."

The contractual provisions addressing incorporation by reference and subdivision (b) of Civil Code section 798.15 lead us to conclude that the Park's rules were part of the contracts between defendants and the Park's residents. Therefore, when the trial court instructed the jury that it was not a breach of the leases for Colony Park to rent spaces for recreational vehicles, the jury would have understood that instruction to mean that renting spaces for recreational vehicles was not a violation of the Park's rules. As a result, the jury's findings that there were no substantial violations of the rules cannot be interpreted as a finding of fact that Colony Park did not rent spaces for recreational vehicles.

### 2. Arguments Presented to the Jury

Defendants contend that the significance of the jury's finding of no substantial violation of the Park's rules should be determined in light of the arguments that counsel presented to the jury. Defendants argue: "During closing argument [plaintiffs'] counsel argued extensively that the admission of RVs into the park was a breach of the park's rules and also a breach of contract. [Citations to reporter's transcript.]"

We have reviewed plaintiffs' closing argument and conclude that defendants have misconstrued the arguments made. Plaintiffs did not argue that *admission* of recreational vehicles was itself a violation of the Park's rules. Indeed, plaintiffs' counsel told the jury: "Now, the Court's instructed you that there's nothing in their leases that keep them from bringing these RVs into the park, but they do have rules and regulations about appearance." Plaintiffs' claims about the appearance of the recreational vehicles are illustrated by their counsel's review of the claims of Mary Lybarger. Plaintiffs' counsel stated that Lybarger had a problem with "the rules not being enforced especially with the RVs. They have their responsibilities: Supposed to have skirting, supposed to have nice landscaping, all the different things. She is upset that they bring these RVs in. There is

39.

no skirting, there is no landscaping, don't have to follow any of the rules. They just come in. It really upset her." The foregoing is an example of plaintiffs' argument that management was not enforcing the Park's rules that affected the appearance of the lots rented for recreational vehicles. Plaintiffs did not argue to the jury that the mere admission of recreational vehicles for use as living quarters was a violation of the Park's rules.

Therefore, contrary to defendants' view, plaintiffs' arguments to the jury do not support the position that the jury came to its own interpretation of the Park's rules and (1) concluded that the rules allowed Colony Park to rent spaces for recreational vehicles or (2) concluded the rules prohibited leasing spaces for recreational vehicles and made a finding of fact that the rule was not violated because no such leases were made.

### 3. *Prejudice Resulting from Exclusion of Claims*

We conclude that the trial court's erroneous interpretation of the Park's rules resulted in prejudice because plaintiffs were not allowed to pursue the claims that defendants violated plaintiffs' right to live in a mobilehome park that did not rent spaces for recreational vehicles.[20]

---

[20] Under the primary right theory of pleading, the violation of this right would be regarded as a "cause of action" that could be pursued under three counts—that is, legal theories. One count would assert that renting spaces for recreational vehicles was a substantial violation of the Park's rules and regulations for purposes of Civil Code section 798.87, subdivision (b). The second count would assert a breach of contract theory. The third count would assert a private nuisance under the common law. (See generally 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 882, pp. 1110-1111 [a single cause of action pleaded in different counts according to different legal theories].)

We note that plaintiffs' legal theories could not have included the legal theory that Colony Park violated Civil Code section 798.22, which states that mobilehome spaces shall not be rented for the accommodations of recreational vehicles, because the statute applies to parks developed after 1981 and the Park began operations in the 1970's.

In *Soule v. General Motors Corp., supra,* 8 Cal.4th 548, the California Supreme Court recognized the principle that in civil cases an appellate court may not reverse based on a "mere *possibility*" of prejudice but instead must "examine the evidence, the arguments, and other factors to determine whether it is *reasonably probable* that instructions allowing application of an erroneous theory *actually* misled the jury. [Citations.]" (*Id.* at p. 581, fn. 11.)

In this case, the instructions did not *allow* the application of an erroneous theory, they *required* the application of a theory that, in view of the text of the Park's rules and parol evidence in the record, was erroneous. Specifically, the jury was told Colony Park was permitted by contract to rent spaces for recreational vehicles. Thus, the instruction actually misled the jury regarding Colony Park's obligations and duties.

Furthermore, misleading the jury on this point harmed plaintiffs because they presented sufficient evidence that, if believed by the jury, would have resulted in the jury deciding Colony Park had committed a substantial violation of the Park's rules, a breach of contract, or both. (See *Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 304 [test for prejudice: if the jury had believed plaintiffs' evidence and been properly instructed, was it reasonably probable the jury would have found in plaintiffs' favor].) In other words, plaintiffs presented substantial evidence that Colony Park had rented spaces for recreational vehicles. Consequently, if the jury had been properly instructed, it is reasonably probable that the jury would have found defendants actually violated the Park's rules and breached the rental agreements.

Because of the prejudice that resulted from preventing the jury from addressing viable legal theories, we need not discuss whether the exclusion of evidence was, in itself, prejudicial.

41.

C.     Waiver and Invited Error[*]

     *1.     Contentions of the Parties*

Defendants contend that plaintiffs agreed to the instruction stating that it was not a breach of contract to rent spaces for recreational vehicles and, as a result, invited or waived any instructional error.

Plaintiffs counter this argument by asserting they did not invite or waive any error when their attorney's "yes" answer to the trial court's question about whether the instructions reviewed by the court and the attorneys were "the instructions as modified and agreed upon by the parties?"  Plaintiffs contend that, under Code of Civil Procedure section 647, they were not required to object to the jury instruction about recreational vehicles and restate their position regarding the proper interpretation of the Park's rules.

Code of Civil Procedure section 647 provides in part:

> "All of the following are deemed excepted to:  … giving an instruction, refusing to give an instruction, or modifying an instruction requested;  … a ruling sustaining or overruling an objection to evidence .…  If the party, at the time when the order, ruling, action or decision is sought or made, or within a reasonable time thereafter, makes known his position thereon, by objection or otherwise, all other orders, rulings, actions or decisions are deemed to have been excepted to."[21]

In plaintiffs' view, they made their position about the interpretation of the Park's rules and regulations known during the August 25, 2010, hearing on defendants' objection to testimony about management's statements that spaces would not be rented for recreational vehicles.  Plaintiffs argue, in effect, that they are deemed to have excepted to (1) the trial court's interpretation of the Park's rules, (2) the related evidentiary ruling and (3) all subsequent action by the court based on that interpretation,

---

[*]     See footnote, *ante,* page 1.

[21]     One commentator stated that the effect of the 1953 amendment that added the last sentence to this section was to make any method of raising a point below the equivalent of a formal exception.  (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 403, p. 461.)

including the instruction that it was not a breach of the leases to rent spaces in the Park for recreational vehicles.

## 2. *Record Regarding the Instructions*

On the 17th day of trial (August 25, 2010), the trial court held an evidentiary hearing on defendants' objection to testimony concerning management's statements to plaintiffs about not renting spaces for recreational vehicles. The court sustained defendants' objection because it interpreted the Park's rules to permit defendants to rent spaces for recreational vehicles.

About seven weeks later (the afternoon of Friday, October 15, 2010), the trial court went through the jury instructions with the attorneys. At the start of the afternoon session, the court stated:

> "[W]e spent a lot of time on these instructions trying to modify these instructions to meet the appropriate facts of this particular case. I certainly appreciate the efforts of all the defense attorneys involved and the plaintiffs' attorneys. [¶] I think for the most part we've reached an agreement how we're going to instruct this jury. There's a couple things we still need to put on the record on the [parties'] respective positions, but we're going to go through this thing."

The trial court then went through the instructions. After listing the general instructions, the court stated its belief that there was an agreement as to the causes of action that plaintiff would present—specifically, public and private nuisance as well as a contract and negligence cause of action. Plaintiffs' counsel stated that was correct. After addressing a number of other instructions, the court reached the instruction on punitive damages and stated "we need to give that."

Next, the court stated: "There is a defense instruction number [4]7 we talked about, but I don't remember what that was dealing with." Defense counsel stated: "That was the Court's ruling that the renting to RVs is not a breach of the lease - - " The court then stated: "Okay. We're going to give that" and began discussing another instruction.

43.

The gist of this exchange is that the court's decision to instruct the jury that defendants did not breach the leases by renting spaces for recreational vehicles was based on its August 2010 ruling that the Park's rules were not ambiguous and allowed spaces to be rented for recreational vehicles.

On Tuesday, October 19, 2010, the court again discussed the jury instructions with the attorneys. After mentioning various instructions, the court stated: "Instruction number 47 for leases [to] RV[s], we'll give that." The court and attorneys continued to go through the instructions. After mentioning the instruction about polling the jury, the court asked: "Now, other than the comments, whatever Mr. Heater has here, are those the instructions as modified and agreed upon by the parties?" Plaintiffs' attorney stated: "Yes, Your Honor."

### 3. Scope of Consent Regarding the Instructions

The issue before us is whether the affirmative answer of plaintiffs' attorney to the question about whether the instructions had been agreed upon by the parties operated as a waiver of the claims that the instruction concerning the rental of spaces for recreational vehicles contained error?

Initially, we note that the erroneous instruction was submitted by defendants. Thus, this is not a situation where plaintiffs invited the error by proposing or otherwise convincing the court to give the erroneous instruction. (See 4 Cal.Jur.3d (2007) Appellate Review, § 273, p. 401 [under doctrine of invited error, a party cannot claim error in the giving of an instruction he or she requested].)

Also, the principle that a party's *failure to object* to civil jury instructions will *not* be deemed a waiver where the instructions are prejudicially erroneous (*Bishop v. Hyundai Motor America* (1996) 44 Cal.App.4th 750, 760) does not apply in this situation because the conduct of plaintiffs' counsel went beyond the failure to object because they expressed their agreement to the instructions.

Ultimately, the question presented concerns the scope of the agreement or consent given by plaintiffs' counsel. For instance, was the scope narrow, such that plaintiffs only agreed that the instructions were of proper form to implement the trial court's earlier rulings? Alternatively, was the scope of the agreement broad, such that the plaintiffs agreed the instructions were correct on all points of law and, thus, expressed plaintiffs' intent to relinquish all claims of instructional error.[22]

The determination of the scope of plaintiffs' consent will be based on an examination of the objective manifestation of the plaintiffs' counsel's intent (i.e., what a reasonable person would believe from the outward manifestations or expression of the attorneys). (See generally *Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141 [assent determined under an objective standard].) We are not concerned with the subjective, unexpressed intentions of plaintiffs' counsel. (*Ibid.*)

The context for understanding the scope of plaintiffs' consent to the jury instructions includes (1) the earlier proceedings in the case and (2) the rules of law contained in Code of Civil Procedure section 647 and the decisions that allow attorneys to make the best of a "bad situation" (i.e., prior erroneous rulings) when dealing with instructions. (See *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212-213 (*Mary M.*).)[23] The earlier proceedings included (1) plaintiffs' counsel's arguments regarding the proper interpretation of the Park's rules, which were made at the evidentiary hearing

---

[22] In denying the motion for new trial, the trial court did not decide whether the agreement reflected an intention by plaintiffs to relinquish all claims that the instruction regarding renting spaces for recreational vehicles contained error. (See *Smith v. Adventist Health System/West, supra,* 182 Cal.App.4th at p. 745 [California law defines waiver as the intentional relinquishment or abandonment of a known right or privilege].)

[23] In the *Mary M.* decision, the California Supreme Court reiterated the principle that an attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which the attorney is not responsible. (*Mary M., supra,* 54 Cal.3d at pp. 212-213.)

45.

on the 17th day of the trial; (2) the trial court's interpretation of the Park's rules at the close of that evidentiary hearing; (3) the fact that plaintiffs had finished presenting their rebuttal evidence on October 14, 2010, and the court informed the jury that "all the evidence is before you"; and (4) the court's two subsequent statements when reviewing the proposed instructions that it was going to give defendants' proposed instruction number 47.

With this context in mind, we will address how an objectively reasonable person would have understood the trial court's question: "[A]re those the instructions as modified and agreed upon by the parties?"

When the trial court asked the question about the instruction being agreed upon, plaintiffs' rebuttal evidence was complete and the jury was told that all the evidence was before it. In such a situation, an objectively reasonable person would not have understood the trial court to be inviting the attorneys to reraise legal or evidentiary issues that had been decided against them during the course of the trial. The implications of such an interpretation do not fit with the status of the case at the time the question was asked. For example, if the question is interpreted as the court asking the parties to revisit legal issues decided during the course of trial, it necessarily would have implied that the court was willing to revisit its prior rulings and, if convinced a ruling was incorrect, remedy that ruling. The remedy for some of those rulings would have been to reopen the evidence and allow the parties to present testimony that the prior ruling foreclosed. Nothing in the record indicated that the court was willing to revisit prior rulings and, if necessary, reopen the evidence.

Instead, when the trial court made its inquiry about the parties' agreement to the instructions, an objectively reasonable person would have understood the trial court's question was designed to eliminate possible claims of instructional error that could have been addressed fully at that stage of the proceedings. Those types of instructional error would have been limited to those purported errors that could have been cured entirely by

46.

rewording the proposed instructions. They would not have included purported errors that involved rulings made by the trial court during the course of the trial that, if reversed, would have required the presentation of additional evidence. Therefore, plaintiffs' counsel acted reasonably when they relied on the protections contained in Code of Civil Procedure section 647 and did not reargue the trial court's prior adverse rulings.

Therefore, we conclude that when plaintiffs' counsel agreed to the jury instructions they did not waive the claim that it was error to instruct the jury that defendants were allowed to rent spaces for recreational vehicles.

D.      Other Grounds for Excluding the Claims Regarding Recreational Vehicles[*]

Defendants contend there are other grounds for concluding that the trial court did not abuse its discretion when it excluded evidence of alleged oral statements that spaces would not be rented for recreational vehicles. Those grounds are that (1) plaintiffs first amended complaint did not specifically allege that defendants breached the contracts or violated Civil Code section 798.87, subdivision (b) by renting spaces for recreational vehicles and (2) plaintiffs discovery responses did not identify a violation of this particular obligation.

First, we note that defendants have not asserted these grounds as a basis for rejecting plaintiffs' challenge to the jury instruction regarding recreational vehicles—a challenge which we have concluded raised a prejudicial error that was not waived.

Second, the trial court did not rely on either of these grounds when it sustained defendants' evidentiary objection to the parol evidence about renting spaces for recreational vehicles. The question of the scope of plaintiffs' FAC was discussed at the hearing on August 25, 2010. Plaintiffs' counsel referred to page nine of the FAC, which includes the allegation that "rules and regulations not properly enforced, resulting in, for

---

[*]      See footnote, *ante,* page 1.

47.

example, Park manager violating the rules; Park rules selectively enforced ….." In response to this reference to the FAC, the trial court stated: "You've got park rules and regulations for breach of contract. All right." Thus, it appears that the trial court believed that the allegations in the FAC were adequate to cover the claims that the Park's rules were breached by renting spaces for recreational vehicles.

As to plaintiffs' discovery responses, the trial court was not explicit. The court asked whether the theory had been brought up in discovery responses and plaintiffs' counsel replied: "My belief it has. I'm not prepared to respond to that particular argument right now, but I think we can go through the interrogatory responses and depositions and solve that issue." At that point, the court dropped the discovery issue and asked to confirm there was no fraud cause of action.

The appellate record contains responses to form interrogatories by certain plaintiffs that set forth the same language about the Park's rules that was contained in the FAC—language that the trial court deemed adequate.

Defendants assert that plaintiffs' response to form interrogatory No. 50.6 denied that there were any ambiguities contained in any agreement alleged in their pleadings. In light of our conclusion that the sentence in the Park's rules stating that "[o]nly mobile homes approved by the Management/Park owner shall be admitted into the Park" was unambiguous and prohibited the renting of spaces for recreational vehicles, we further conclude that plaintiffs' discovery response regarding the absence of ambiguity was appropriate. As a result, that response does not bar plaintiffs from asserting the Park's rules prohibited the renting of spaces for recreational vehicles.

E.    Remand[*]

The trial court's erroneous evidentiary ruling and its erroneous instruction to the jury that defendants did not breach the leases by renting spaces for recreational vehicles precluded plaintiffs from pursuing claims that renting spaces for recreational vehicles violated their rights.  On remand, plaintiffs shall be allowed to pursue legal theories that this alleged violation of the Park's rules constituted (1) a public nuisance for purposes of subdivision (b) of Civil Code section 798.87, (2) a breach of contract, and/or (3) a private nuisance under the common law.[24]  The statutory theory would require the trier of fact also to decide whether any violation of the Park's rules was "substantial" for purposes of subdivision (b) of Civil Code section 798.87.

We cannot state with certainty the exact factual issues that the trier of fact must address on remand to resolve the application of these legal theories to the facts of the case because we are unable to predict whether defendants will (1) avail themselves of the opportunity to present parol evidence and (2) actually submit competent parol evidence that supports their view that the Park's rules contain a latent ambiguity.  Because of this

---

[*]    See footnote, *ante,* page 1.

[24]    We have used the term "common law" to distinguish this legal theory from a nuisance under Civil Code section 798.87 (see fns. 15 & 21, *ante*), even though many of the common law principles regarding nuisance have been codified in Civil Code sections 3479 to 3503.  (See *City of National City v. Wiener* (1992) 3 Cal.4th 832, 852, fn. 2 (conc. & dis. opn. of Mosk, J.) ["common law of nuisance has been codified in our Civil Code"].)

The elements for the common law type of private nuisance include a (1) substantial and (2) unreasonable (3) interference by defendants with the use and enjoyment of land that (4) caused (5) the plaintiff to suffer harm.  (*Monks*, *supra*, 167 Cal.App.4th at pp. 302-303; see BAJI No. 8.60 [private nuisance]; CACI No. 2021 [private nuisance].)  A "substantial" interference is one that is a real and appreciable invasion of the plaintiffs' interests or is definitely offensive, seriously annoying or intolerable.  (*Monks*, *supra*, at p. 303; see Civ. Code, § 3479; BAJI No. 8.60.)  As to unreasonableness, the primary test is whether the gravity of the harm outweighs the social utility of the conduct.  (*Monks*, *supra*, at p. 303; BAJI No. 8.60.)

49.

uncertainty, we will address, in general terms, the two primary ways the case might unfold on remand.

### 1. Ambiguity Resolved by Trier of Fact's Interpretation

If defendants attempt to present parol evidence that shows the Park's rules contain a latent ambiguity, the trial court should (1) provisionally receive that evidence; (2) determine whether the proffered evidence is relevant (i.e., competent) to determining the meaning of the Park's rules; (3) consider all relevant parol evidence, whether offered by defendants or plaintiffs; and (4) decide the legal question whether the Park's rules contain a latent ambiguity—that is, are reasonably susceptible to the interpretation that Colony Park is allowed to rent spaces for recreational vehicles. (See *Winet v. Price*, *supra*, 4 Cal.App.4th at pp. 1165-1166.)

If the trial court determines that an ambiguity exists, then the question of the proper interpretation of the Park's rules should be presented to the trier of fact.[25] If the trier of fact is a jury, then the jury should be instructed that it must determine the meaning of the Park's rules (i.e., resolve the ambiguity) before determining whether Colony Park, in fact, violated the rules.

### 2. No Latent Ambiguity

Alternatively, if defendants do not attempt to present parol evidence or the parol evidence they present does not demonstrate the existence of a latent ambiguity in the Park's rules, then the trier of fact will not be required to determine the meaning of the

---

[25] In the circumstances of this case, the proper interpretation of the Park's rules will not present a question of law because any competent parol evidence presented by the defendants will conflict with the parol evidence offered by the plaintiffs at trial. The plaintiffs' evidence consisted of testimony by some plaintiffs that the Park manager told them when they moved in that the Park would not rent spaces for recreational vehicles. When competent parol evidence conflicts, the interpretation of the instrument presents a question of fact. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) This question of fact must be resolved by the trier of fact.

Park's rules. Instead, the trier of fact must apply the interpretation of the Park's rules adopted in this opinion. For example, if a jury is used as the trier of fact on remand, the jury should be instructed that (1) the Park's rules and regulations prohibit Colony Park from renting spaces for recreational vehicles and (2) a violation of this rule by Colony Park constitutes a breach of contract because the Park's rules are incorporated into the rental contracts. The jury also should be directed to decide whether Colony Park in fact rented any lots for such use.

The parties and the trial court should not interpret the foregoing discussion as covering *all* of the factual issues that might need to be resolved by the trier of fact on remand regarding the application of the Park's rules. Our directions regarding the further proceedings do not "direct a new trial" pursuant to Code of Civil Procedure section 43 on the recreational vehicle claims because we do not mean to imply that the parties must go to trial and cannot resolve those claims by an alternate means.

### 3. *Effect on Special Verdicts*

The determination that the 63 plaintiffs pursuing this appeal have demonstrated prejudicial error means that some, but not all, of the jury's findings in the special verdicts must be vacated. Those findings not affected by the error will remain intact.

As to the special verdict for public nuisance, the prejudicial error involving the Park's rule about recreational vehicles affected the jury's answers to Question No. 2, which addressed whether there was a substantial violation of the Park's rules. Therefore, this finding must be vacated.

As to the special verdicts for the individual plaintiffs, the prejudicial error affected the jury's answers to Question No. 1, which addressed whether defendants breached their contract with that particular plaintiff, and Question No. 5, which addressed whether there was a substantial violation of the Park's rules as to that particular plaintiff. Accordingly,

the jury's findings on these two questions must be vacated as to the 63 plaintiffs who appealed.

## VI.  EXCLUSION OF HARRIS'S QUESTIONNAIRE[*]

### A.  Background

During the trial, defendants presented the testimony of Crissie Harris, the woman who began working as the resident manager of the Park in September 2006.  She was an important witness for defendants because she had personally observed conditions at the Park and dealt with complaints from residents.  Besides being the manager, the 27-year-old had lived at the Park from the time she was five or six years old, except for a brief time when she was 18 or 19.  During her direct examination at trial, Harris testified that she had not experienced problems with the Park's sewer system, utilities, other facilities or common areas.

During Harris's cross-examination, plaintiffs' counsel asked her a series of approximately 15 questions about whether she recalled complaining about certain problems before she became the Park's manager.  Plaintiffs' counsel formulated these questions using a questionnaire about conditions at the Park that Harris purportedly completed about six months before she became the manager.  The cross-examination addressed whether Harris recalled complaining about sewer problems, slow-flushing toilets, low water pressure, poor drainage, electrical service, cracked and potholed roads, poor street lighting, the pool and Jacuzzi being dirty, selective enforcement of the Park's rules, vacant lots not being maintained, and other problems.  Harris answered "No" to all of the questions.

Defense counsel then requested a side-bar.  The trial court granted the request, dismissed the jury 30 minutes early, and held a hearing on defense counsel's objection.

---

[*]     See footnote, *ante,* page 1.

At that hearing, the court considered whether to allow plaintiffs' counsel to use Harris's questionnaire for purposes of cross-examination. Harris's questionnaire was dated March 19, 2006, and had boxes checked indicating that she experienced problems at the Park relating to the plumbing and sewer system, low water pressure, poor rainwater drainage, electrical problems, poor street lighting, and lack of maintenance of the pool, Jacuzzi, carwash area and vacant lots. Defense counsel asserted that the questionnaire could not be used because (1) it was subject to the attorney-client privilege and Harris had not waived that privilege and (2) the questionnaire was not produced in response to defendants' discovery requests, which was "clear sandbagging."

During the hearing, the trial court asked plaintiffs' counsel why Harris's questionnaire had not been produced during discovery. Plaintiffs' counsel answered that Harris was not a plaintiff and the document production request asked for plaintiffs' questionnaires. Defense counsel disputed plaintiffs' interpretation of the discovery requests and asserted the questionnaire was covered.

The discovery propounded by defendants included demands for production and inspection of documents. Those demands included requests for:

> "11. Any and all **WRITINGS** regarding any questionnaire **YOU** have received regarding the **SUBJECT PROPERTY**.

> "12. Any and all **WRITINGS** in **YOUR** possession regarding any complaints made by any other resident at the **SUBJECT PROPERTY** regarding maintenance."[26]

Defendants also sent plaintiffs form interrogatories. Form Interrogatory No. 12.3 asked whether the plaintiffs, or anyone acting on their behalf, obtained a written or recorded statement from any individual concerning the "incident" and, if so, the identity of the persons who gave and took the statement. The record contains examples of

---

[26] The document requests defined "**YOU**" and "**YOUR**" to refer to the particular plaintiff "and/or his/her agents, employees and attorneys."

plaintiffs' responses to this interrogatory.  Plaintiffs objected to the interrogatory as vague and ambiguous because the meaning of the term "incident" could not be readily ascertained and then responded "No" with the reservation that they had not waived the objection.

At the hearing, the trial court stated that Harris's questionnaire should have been produced.  Plaintiffs' counsel then presented the legal argument that a party was not required to produce discovery documents that were going to be used for impeachment only and referred to Federal Rules of Civil Procedure, rule 26.[27]

Ultimately, the trial court determined that the questionnaire should have been produced during discovery and could not be used by plaintiffs' counsel during cross-examination of Harris.[28]  Also, the court admonished the jury to disregard the questions and answers asked by plaintiffs' counsel about Harris's experiences at the Park.

B.     Standard of Review

Code of Civil Procedure section 2023.030 provides that "[t]o the extent authorized by the chapter governing any particular discovery method or any other provision of this title, the court, after notice to any affected party, person, or attorney, and after opportunity for hearing, may impose the following sanctions against anyone engaging in conduct that is a misuse of the discovery process:  [¶] … [¶]  (b)  .…  The court may also impose an issue sanction by an order prohibiting any party engaging in the misuse of the discovery process from supporting or opposing designated claims or defenses.  [¶]  (c)

---

[27]     The rule addresses pretrial disclosures, stating that "a party must provide the other parties and promptly file the following information about the evidence that it may present at trial *other than solely for impeachment .…*"  (Fed. Rules Civ. Proc., rule 26(a)(3)(A), 28 U.S.C., italics added.)

[28]     The court explicitly determined that document request No. 11 covered the questionnaire and that plaintiffs' counsel's interpretation of the request was incorrect.

54.

The court may impose an evidence sanction by an order prohibiting any party engaging in the misuse of the discovery process from introducing designated matters in evidence."

The trial court's order regarding the Harris questionnaire was a combination of an evidentiary sanction and a partial issue sanction. The court prohibited the questionnaire from being offered into evidence and it also prohibited plaintiffs' counsel from addressing the issue of Harris's credibility through the use of the questionnaire.

Generally, appellate courts review a trial court's imposition of a discovery sanction under the deferential abuse of discretion standard. (*Doe v. U.S. Swimming, Inc.* (2011) 200 Cal.App.4th 1424, 1435; *Pate v. Channel Lumber Co.* (1997) 51 Cal.App.4th 1447, 1454 [trial court's decision to exclude documents defendant omitted from discovery responses was not an abuse of discretion].) The imposition of issue or evidentiary sanctions is appropriate even if there is no prior order compelling production, provided that the discovery responses were such that the propounding party would have no reason to seek such an order. (*Pate v. Channel Lumber Co.*, *supra*, at p. 1456.) For example, when a propounding party is told such documents do not exist, that party cannot be expected to seek an order compelling production. (*Ibid*.)

Furthermore, a trial court's ruling to admit or exclude *evidence offered for impeachment* also is reviewed for abuse of discretion and will be upheld unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.) Stated otherwise, plaintiffs will have established reversible error only if they demonstrate (1) an abuse of discretion and (2) prejudice—that is, a reasonable probability of a more favorable verdict. (E.g., *Smalley v. Baty* (2005) 128 Cal.App.4th 977, 979, 987 [trial court's exclusion of evidence was a prejudicial abuse of discretion that compelled reversal].)

C.    Contentions

Plaintiffs contend the trial court's rulings regarding Harris's questionnaire constituted error.  Plaintiffs assert that their position "raises two questions that appear to be of first impression under California law:  [¶]  (1)  Can a document not produced in discovery, be used to refresh an opposing witness's recollection given that if it does, the document itself is never shown to the jury, and never comes into evidence?  [¶] (2)  Can a document not produced in discovery, be used to impeach an opposing [witness] who has committed perjury?"

Plaintiffs argue that if these questions are resolved in their favor, the only potential detriment to defendants from the failure to produce "the questionnaire in discovery would have been their inability to present false testimony at trial."  Plaintiffs support their position by asserting that the policies underlying California's discovery statutes do not favor protecting false testimony.

D.    Analysis

When reviewing a trial court's order imposing discovery sanctions, we must follow the well-established rule that the order is presumed correct and indulge all presumptions and intendments in its favor on matters as to which the record is silent. (*Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1217.)  This rule plays an important role in our analysis of plaintiffs' contentions because plaintiffs have presumed facts favorable to their position, rather than in favor of the order.  The particular facts relied upon by plaintiffs are that (1) Harris lied in her testimony and (2) the questionnaire would have refreshed Harris's recollection.

We cannot presume that Harris lied during her direct examination about conditions at the Park or that she lied on cross-examination when she stated she did not recall complaining about those conditions.  The trial court noted the possibility that Harris may have forgotten the problems and did not recall them or, alternatively, she might not have been the one who checked the boxes on her questionnaire.  The court did not explicitly

56.

decide the question of her veracity in favor of the plaintiffs and, therefore, the applicable rules of law do not allow us to accept plaintiffs' position that Harris committed perjury. Thus, the second question framed by plaintiffs—whether "a document not produced in discovery [can] be used to impeach an opposing [witness] who has committed perjury"—is not actually before this court.

Similarly, the other question framed by plaintiffs—whether "a document not produced in discovery [can] be used to refresh an opposing witness's recollection given that if it does, the document itself is never shown to the jury, and never comes into evidence"—also is not presented by the circumstances of this case. At the hearing outside the presence of the jury, the court asked Harris about the questionnaire after she had an opportunity to review it. Harris stated that she remembered attending a meeting of a residents' committee where the questionnaires were handed out, and she remembered taking a questionnaire. Harris also stated that she only recalled filling out the first page of the questionnaire. The trial court's inquiry included the following exchange.

"Q  Did you fill out anything about plumbing or sewer, water, drainage, anthing like that?

"A  I do not recall filling any of that form out. [¶] … [¶]

"Q  Do you recall filling [the questionnaire] out?

"A  No, sir.

"Q  Did you fill that out?

"A  I don't think so."

Thus, plaintiffs claim that the questionnaire could have been used to refresh Harris's recollection is not supported by the record. To the contrary, the transcript of her testimony at the hearing outside the presence of the jury shows that the questionnaire did not refresh her recollection about making complaints regarding the conditions at the Park.

57.

Consequently, the first question framed by plaintiffs is not presented by the facts of this case.

Therefore, the arguments presented by plaintiffs have not demonstrated that the trial court abused its discretion when it imposed the discovery sanctions that prohibited plaintiffs from using the Harris questionnaire.

VII.    AMENDED JUDGMENT AND SCOPE OF REVERSAL[*]

The 63 plaintiffs pursuing this appeal have demonstrated reversible error as to the claims that Colony Park violated the Park's rules by renting spaces for recreational vehicles.  Therefore, they are entitled to a reversal of the amended judgment and a remand of the recreational vehicle claims for further proceedings.  The award of attorney fees and costs against these plaintiffs was premised on the fact that they had lost all of their claims against Colony Park.  Because this premise no longer exists, it follows that the award of attorney fees and costs contained in the amended judgment cannot remain in effect against the 63 plaintiffs who obtained a partial victory on appeal.

A question has arisen about the scope of the reversal and whether it should affect the five plaintiffs who started the trial and lost, but did not appeal.  The legal issues relevant to this question were not addressed in the appellate briefing submitted before oral argument and the issuance of our initial opinion.  Consequently, we granted defendants' petition for rehearing and directed the parties to submit supplemental briefing.  (See Gov. Code, § 68081 [requirement for supplemental briefing of issues "not proposed or briefed by any party"].)  We specifically asked the parties to address issues on the severability of the portions of the judgment concerning the nonappellants, the interdependence of the portions of the judgment, and this court's "power to do that which justice requires .…"  (*Estate of McDill* (1975) 14 Cal.3d 831, 840; see *Gonzales v. R. J.*

---

[*]    See footnote, *ante*, page 1.

*Novick Construc. Co.* (1978) 20 Cal.3d 798, 805-806 [interdependence and severability].) We also stated our interest in the parties' analysis of cases, whether from California or other jurisdictions, involving joint and several liability among appealing and nonappealing parties. (E.g., *In re Marriage of Reese & Guy* (1999) 73 Cal.App.4th 1214, 1221-1222; *Belz v. Belz* (Tex.App. 1984) 667 S.W.2d 240, 243-244.)

A. Attorney Fees and Costs

1. *Provisions of Amended Judgment Concerning Fees and Costs*

Paragraph 6 of the amended judgment awarded a total of $1,982,643.30 in attorney fees and costs against the plaintiffs identified in three subparagraphs.

Subparagraph 6.a awarded $1,975,543.33, jointly and severally, against the 66 plaintiffs who went to verdict and lost. Of these plaintiffs, 63 appealed and three did not—namely, Darlene Henslee, John Pierce and Elzina Wortell.

Subparagraph 6.b addressed the liability for attorney fees and costs of the Estate of Nancy Faughn and the Estate of Walter Faughn, the two plaintiffs who lost a motion for nonsuit on the 31st day of the trial because a legal representative of the estates had not been substituted into the lawsuit. They were held jointly and severally liable for 75 percent of the award contained in subparagraph 6.a (i.e., approximately $1.5 million).

Subparagraph 6.c stated that Colony Park was entitled to collect $7,100 in attorney fees and no additional costs, jointly and severally, from the eight plaintiffs whose claims were dismissed before trial because of a terminating sanction.

2. *Interwoven Issues*

Ordinarily, an appeal by less than all of the parties who lost includes only the portion of the judgment affecting the appealing parties and, as to the nonappealing parties, the judgment is considered final and not reviewable. (See Eisenberg et al., Cal Practice Guide: Civil Appeals and Writs (The Rutter Group 2013) ¶ 8:189, p. 8-141 (rev. #1 2008) [errors against nonappealing parties]; 5 C.J.S. (2013) Appeal and Error, § 1079

59.

[where only some parties appeal].)  An important exception to this rule applies when the portions of the judgment appealed from is so interwoven with the remainder, that the appeal from the part involves the consideration of the whole and, consequently, the reversal ordered may extend to the entire judgment.  (*Estate of McDill*, *supra*, 14 Cal.3d at p. 840)

In this case, we conclude that the award of attorney fees and costs against the five plaintiffs who did not appeal—namely, Darlene Henslee, John Pierce, Elzina Wortell, the Estate of Nancy Faughn and the Estate of Walter Faughn—is interwoven with the award against the 63 plaintiffs who appealed.  The liability for the award is joint and several and is based on the fact that none of the 68 plaintiffs obtained any relief against the defendants.  If the award is allowed to stand against the five nonappellants, they will be made worse off as a result of the appellants' victory because the joint and several liability will be divided among five people instead of 68.  Furthermore, if we allow the five nonappellants to remain liable for approximately $2 million in fees and costs and if some or all of the appellants obtain a victory in the further proceedings conducted on remand, then the nonappellants will end up being liable for fees and costs defendants incurred in litigating claims ultimately won by the successful plaintiffs.  Under these circumstances, we conclude that the award of attorney fees and costs against all 68 plaintiffs who started trial and lost should be reversed and the matter of fees and costs should be reconsidered after the final resolution of the claims concerning the rental of spaces for recreational vehicles.  (See *In re Marriage of Reese & Guy, supra,* 73 Cal.App.4th at pp. 1221-1222 [order imposing $20,000 in sanctions against attorney and his client was joint and several; only attorney appealed, but appellate court reversed the award as to both the attorney and the client].)

B.   Defendants' Nonliability on Plaintiffs' Claims

### 1.   *Contents of the Amended Judgment*

Paragraph 1 of the amended judgment listed 76 plaintiffs and stated that they shall take nothing on all of their causes of action.  The 76 plaintiffs include (1) the 63 who appealed, (2) the three who lost their jury verdicts and did not appeal, (3) the two nonsuited plaintiffs, and (4) the eight plaintiffs dismissed as a terminating sanction.

Paragraph 2 of the amended judgment stated that judgment was entered in favor of Colony Park on *all* of plaintiffs' claims for public nuisance, breach of contract, and intentional interference with property rights.  This paragraph is redundant to paragraphs 1, 3, 4 and 5.  Paragraphs 3, 4 and 5 indicate that the Avanas, Barragans and Cermenos won only one cause of action and lost their other causes of action.

Paragraph 7 of the amended judgment stated that, pursuant to the agreement of the parties, the judgment encompassed all claims against Colony Park through the date of entry of the judgment, rather than the date when the complaint was filed.

### 2.   *Severability of Plaintiffs' Claims*

We conclude that the ordinary rule, rather than the exception, applies to the part of the judgment that indicates the nonappealing plaintiffs lost their causes of action against Colony Park.  Unlike the award of attorney fees and costs, the nonappealing plaintiffs will not be made worse off as a result of the appellants obtaining this reversal and pursuing further proceedings on the claims involving the rental of spaces for recreational vehicles.  Also, they chose not to appeal their loss and "the ends of justice" do not weigh in favor of giving them an unsought opportunity to pursue the claims concerning recreational vehicles.  (See *Estate of McDill*, *supra*, 14 Cal.3d at p. 841.)

C.   Provisions of Amended Judgment That Will Remain In Effect

The amended judgment filed on February 7, 2012, will remain in full force and effect as to (1) the Avanas, the Barragans and the Cermenos—the six plaintiffs who won at trial and did not appeal—and (2) the eight plaintiffs who were dismissed pursuant to a

terminating sanction—namely, Tina Beard, Michael Cooper, Terri Cooper, Billy Gann, Rodney Johnston, Charles Sammons, Melinda Sue Sammons, and the Estate of Oletha Singleton.

Thus, the amended judgment filed on February 7, 2012, will serve as the one final judgment that disposes of all of the issues between Colony Park and six winning plaintiffs and the eight plaintiffs dismissed as a terminating sanction.

In comparison, if we allowed the amended judgment to be the document that stated the results of the five nonappealing plaintiffs on their claims against Colony Park and a future judgment to address their potential liability to Colony Park for attorney fees and costs, there would be two documents, rather than a single final judgment, that disposed of all of the issues between Colony Park and those five nonappealing plaintiffs. To avoid two judgments for these individuals, we will vacate the portions of the amended judgment that set forth the result of their claims against Colony Park and direct the trial court to reinstate those results in the future judgment that will be entered after the further proceedings on remand are completed and the matter of attorney fees and costs is addressed anew in light of the results of the further proceedings.

Our decision to vacate the amended judgment in this manner should not be interpreted to mean that the five plaintiffs who started trial and lost get a second chance at their causes of action. The only matter on which they shall receive a second chance, and the ability to reargue, is the award for attorney fees and costs, which will not be decided until after the further proceedings have resolved the claims concerning Colony Park's violation of the Park's rules by renting spaces for recreational vehicles. The resolution of those claims may affect the amount of the nonappellants' liability for fees and costs.

Also, our decision to vacate the amended judgment in this manner should not be interpreted as giving any plaintiffs another opportunity to pursue the claim for intentional interference with property rights. The future judgment should indicate that particular claim was not reopened.

## DISPOSITION

The amended judgment filed on February 7, 2012, is reversed in part as follows.

Paragraph Nos. 1 and 7 are vacated as to the 68 unsuccessful plaintiffs and shall remain in effect as to the six successful plaintiffs (i.e., the Avanas, the Barragans and the Cermenos) and the eight plaintiffs who were dismissed as a terminating sanction (i.e., Tina Beard, Michael Cooper, Terri Cooper, Billy Gann, Rodney Johnston, Charles Sammons, Melinda Sue Sammons, and the Estate of Oletha Singleton).

Paragraph No. 2 is vacated in its entirety.

Subparagraph Nos. 6.a and 6.b, which concern the award of attorney fees and costs against the 68 unsuccessful plaintiffs who went to trial and obtained no net monetary recovery, are vacated.

Also vacated are the parts of the amended judgment that set forth the jury's answers to (1) Question No. 2 in the special verdict for public nuisance; (2) Question No. 1 in the special verdicts for the individual plaintiffs, which addressed whether defendants breached their contract with that particular plaintiff; and (3) Question No. 5 in the special verdicts for the individual plaintiffs, which addressed whether there was a substantial violation of the Park's rules as to that particular plaintiff. The further proceedings conducted after remand will resolve the issues presented in these questions as to the 63 plaintiffs who filed this appeal.

The matter is remanded to the trial court for further proceedings not inconsistent with this opinion, including without limitation the discussion of remand in part V.E, *ante*, and the discussion part VII, *ante*.

Any future judgment entered in this matter, besides setting forth the results of the further proceedings, shall put into final effect (i) the jury's answers in the special verdicts for Darlene Henslee, John Pierce and Elzina Wortell; (ii) the order granting nonsuit against the Estate of Nancy Faughn and the Estate of Walter Faughn; and (iii) the prior disposition of the claim for intentional interference with property rights.

The parties shall bear their own costs on appeal.

_____
Franson, J.

WE CONCUR:

_____
Poochigian, Acting P.J.

_____
Peña, J.