Filed 9/10/20  Kennedy v. City of Fresno CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| STEVEN KENNEDY,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF FRESNO,<br><br>Defendant and Appellant. | F077029, F077585<br><br>(Super. Ct. No. 14CECG02334)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment and order of the Superior Court of Fresno County. Rosemary T. McGuire, Judge.

Baradat & Paboojian, Warren R. Paboojian, Lynne Thaxter Brown, Adam B. Stirrup and Stephanie H. Borchers for Plaintiff and Appellant.

Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, Catherine E. Bennett, William A. Bruce and R. Scott Kimsey for Defendant and Appellant.

-ooOoo-

In this consolidated appeal, plaintiff Steven Kennedy (Kennedy) appeals from a jury verdict rejecting his assertion defendant City of Fresno (Fresno) maintained a dangerous intersection and thus was liable for injuries Kennedy suffered in a collision occurring at that intersection.  Kennedy alleges the trial court made certain erroneous evidentiary rulings that prejudicially affected his case.  Fresno separately appeals following the denial of its expert costs request under Code of Civil Procedure section 998

(section 998). Fresno claims the trial court incorrectly determined its settlement offer was invalid. For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We begin, focusing on Kennedy's appeal. We discuss the facts of Fresno's appeal when resolving that portion of the case. The impetus for this litigation was the collision between a motorcycle and a vehicle at the intersection of North Cedar Avenue and East Bulldog Lane (the intersection) near California State University, Fresno. According to the second amended complaint, "On April 30, 2014, at approximately 3:30 p.m., [Kennedy] was riding his motorcycle southbound on North Cedar Avenue approaching the intersection with East Bulldog Lane in Fresno, California .… [Michael Bravo] was driving a Dodge Avenger northbound on North Cedar Avenue approaching the [intersection], failed to recognize that [Kennedy] had the right of way and made a [U]-turn directly in front of and into [Kennedy]'s path causing the two vehicles to collide. As a result of the collision, … [Kennedy] suffered serious and permanent bodily injuries, including but not limited to, amputation of his left leg."

Fresno was added to the case in Kennedy's first amended complaint. There Kennedy alleged that this accident occurred, in part, because the intersection was dangerous and thus that Fresno should be held liable for Kennedy's damages. In this first amended complaint, Kennedy alleged the intersection was dangerous because it lacked "protective left[-]turn phasing" for north and southbound traffic, in essence that it lacked a left-turn light. This complaint was successfully demurred because Fresno is entitled to immunity for a lack of signal lights at intersections under Government Code section 830.4, a point not contested in this appeal.

In his subsequent second amended complaint, Kennedy made several additional allegations regarding the dangerous nature of the intersection. The theory of liability presented focused on a combination of factors including the " 't-intersection' " nature of the location, increased and high traffic volume, substandard curb and median heights,

2.

substandard lane widths, improperly placed trees and signs, and improperly phased lights, such that drivers making left or U-turns would have a false sense of security and end up making dangerous turns due to the creation of a concealed trap.

Kennedy ultimately proceeded to trial on this theory.

*Relevant Evidentiary Rulings*

Relevant to this appeal, Fresno filed several motions in limine designed to curtail the scope of evidence demonstrating a dangerous condition existed at the intersection. In its motion in limine No. 1,[1] which sought to exclude Kennedy's expert from testifying, Fresno set out its general argument why Kennedy's evidence should be limited. Fresno argued that the nature of Kennedy's contentions required the use of expert testimony to establish a dangerous condition. Focusing on the requirements for proper design of an intersection, Fresno argued that whether a particular intersection was improperly designed was a complex question that was not within the common knowledge of laypersons. It pointed out that licensed traffic engineers with at least a bachelor's degree are required for proper design under industry standards.

In motion in limine No. 5, Fresno expanded on this theory to argue the court should exclude non-expert opinion testimony from Diana Katen (Katen), a witness offered by Kennedy to demonstrate others had seen and complained of the dangerous nature of the intersection. Kennedy opposed these motions, arguing "the dangerous condition issue on the property is a factual issue for the jury to decide based on the evidence that's presented," whether that evidence is from laypersons, Fresno itself, or an expert.

The court determined that expert testimony would be governed by the Code of Civil Procedure and Evidence Code and, although permitting specific arguments later,

---

[1]     It appears this motion was presented to the court in an "A" through "G" format that encompassed at least some of the arguments of motion in limine No. 5. For the purposes of this opinion, we refer to the motions by their underlying numbers.

rejected motion in limine No. 1. It then turned to discussing the non-expert testimony partially subject to motion in limine No. 5. On this aspect, the court provided a tentative ruling, stating "that if you have a witness that's going to come in and say, yeah, this was dangerous, I don't know that that's appropriate testimony for a lay witness to basically render an opinion that the intersection was dangerous." The argument then turned to certain documents reflecting citizen complaints and whether those would be admissible. The court explained to counsel that "there's not to be any reference to the content of any of the complaints or the opinions of the lay witnesses in jury voir dire or opening statements until I have a chance to look at this more fully." When motion in limine No. 5 was separately argued later, the court confirmed that "Katen can testify with regard to her personal observations with regard to the intersection, not to what anybody has told her about the intersection. And not giving any opinion that she thought the intersection was dangerous."

In its motion in limine No. 9, Fresno moved to exclude evidence of post-accident changes to or accidents at the intersection. Fresno argued any post-accident improvements, and the accident history post-improvements, were both barred under Government Code section 830.5, subdivision (b). The court expressed its tentative intent to grant the motion but asked for clarity on its scope. After extensive discussion, the court ruled that it would "grant the motion as it relates to subsequent accidents, subsequent acts after the subject accident," but that the court would revisit the issue if evidence was offered for impeachment purposes. Kennedy later attempted to utilize evidence of post-accident activity, including a letter from a police officer on the perceived dangerousness of the intersection, in cross-examination, but the trial court ruled such evidence could not be introduced for any purpose.

In addition, an issue arose during trial regarding the time frame of evidence that could be admitted to demonstrate notice of the alleged dangerous condition. Kennedy desired to introduce evidence dating back to 1979, showing Fresno had notice of citizen

complaints of dangerousness. Fresno objected, contending such evidence could not be introduced prior to evidence showing the intersection was dangerous at the time of the complaint, a point Fresno claimed could not be proven because Kennedy's expert had not opined on dangerousness prior to 2000. The trial court ultimately ruled that Kennedy had introduced evidence of dangerousness as early as 1994, and limited Kennedy's evidence of notice to evidence arising after that date.

*Jury Verdict*

The case ultimately proceeded to a jury verdict. The parties utilized a special verdict form that asked the following questions, among others:

"1. Was the intersection of [North] Cedar Avenue and [East] Bulldog Lane in a dangerous condition at the time of the incident? [¶] … [¶] If your answer to this question is yes, then answer the next question. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

"2. Did the dangerous condition create a reasonably foreseeable risk that this kind of incident would occur? [¶] … [¶]

"3. Did … Fresno have notice of the dangerous condition for a long enough time for … Fresno to have protected against it? [¶] … [¶]

"4. Was the dangerous condition a substantial factor in causing harm to … Kennedy?"

The jury returned a verdict of "No" to the first question, concluding the intersection was not dangerous and, following the instructions, did not reach any of the other questions on the special verdict form.

## DISCUSSION

For the purposes of Kennedy's appeal, Kennedy first argues the trial court incorrectly excluded "non-expert" opinion testimony from his witnesses, requiring him to exclusively offer expert testimony of dangerousness. Second, Kennedy argues the trial court's limitation on notice evidence to that arising after 1994 was erroneous. Third,

Kennedy takes issue with the court's determination that post-accident evidence could not be used for any purpose. With respect to Fresno's appeal, discussed further below, Fresno takes issue with the trial court's determination that its pretrial settlement offer did not satisfy the requirements necessary to award expert costs under section 998. We consider each argument below.

### *The Trial Court Correctly Excluded "Non-Expert" Opinion Testimony*

Kennedy's first assertion of error contends that the trial court incorrectly determined that expert testimony was required to demonstrate the intersection qualified as a dangerous condition. Kennedy argues that the case law demonstrates lay opinion evidence is admissible to prove the existence of a dangerous condition in all circumstances, and thus the trial court was incorrect in ordering that Kennedy's lay witnesses not describe the intersection as dangerous. Kennedy further contends the trial court incorrectly denied his motion for a new trial by misstating the import of its prior rulings to imply they did not exclude lay witness opinions on dangerousness.

*Standard of Review and Applicable Law*

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." (Evid. Code, § 800.) "The meaning of subdivision (a) is clear: 'A witness who is not testifying as an expert may testify in the form of an opinion only if the opinion is based on his own perception.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1306, italics omitted.) "By contrast, when a lay witness offers an opinion that goes beyond the facts the witness personally observed, it is held inadmissible." (*Id*. at p. 1308.) "The purpose of [subdivision (b)] is to determine when a lay witness may supplement or illustrate his factual testimony by drawing therefrom his own conclusion or inference, i.e., his opinion: under the Evidence

6.

Code that opinion need only be 'helpful'—rather than necessary—to understanding the witness's testimony." (*Id*. at p. 1306, fn. 11.)

Thus, " '[a] lay witness may express an opinion based on his or her perception, but only where helpful to a clear understanding of the witness's testimony [citation], "i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed." [Citation.]' [Citation.] Such a situation may arise when a witness's impression of what he or she observes regarding the appearance and demeanor of another rests on 'subtle or complex interactions' between them [citation] or when it is impossible to otherwise adequately convey to the jury the witness's concrete observations." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 130.) "Matters that go beyond common experience and require particular scientific knowledge may not properly be the subject of lay opinion testimony." (*Id*. at p. 131.)

"Generally, a trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion." (*Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1481.) " ' "[W]hile the concept 'abuse of discretion' is not easily susceptible [of] precise definition, the appropriate test has been enunciated in terms of whether or not the trial court exceeded ' "the bounds of reason, all of the circumstances before it being considered.…" ' [Citations.]" [Citation.] "A decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' [Citations.] In the absence of a clear showing that its decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate objectives and, accordingly, its discretionary determinations ought not [to] be set aside on review." ' " (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 44–45.)

*The Court's Order Did Not Wholly Exclude Lay Witness Testimony*

In his opening brief, Kennedy presents the following argument asserting an error arose in this case: "Ample case law demonstrates that a dangerous condition on public

property can be established by the opinions and perceptions of lay witnesses and that such evidence, including lay witnesses' opinions and perceptions that property is in a 'dangerous' or 'unsafe' condition, is competent and admissible on the issue." Reciting a plethora of cases in which such perception or opinion testimony was permitted, Kennedy contends that the trial court in this case erred because it wholly excluded any perception or opinion evidence on the condition of the intersection and certain lay witnesses' opinions that the intersection was, in fact, dangerous. Kennedy further contends the trial court misstated the import of its own ruling by suggesting that its order did not exclude non-expert evidence to establish a dangerous condition and asserts that the non-expert witnesses Kennedy was able to have testify were forced to give less effective testimony because those witnesses could only recount their perceptions and could not describe the intersection using words such as "dangerous" or "unsafe."

In response, Fresno contends the trial court did not make such a sweeping ruling, but rather, based on the nature of Kennedy's theory of liability, concluded that lay witnesses could present evidence concerning their perceptions but could not opine on the dangerousness of the intersection. Noting that the litigation history and applicable law precluded theories that the intersection was dangerous because it lacked traffic signals—a claim upon which Fresno is immune under Government Code section 830.8—and because there was an increase in traffic over time, Fresno contends that the remaining theories presented relied upon technical aspects of the intersection's construction upon which lay opinion testimony could shed no meaningful light.

The nature of the dispute between the parties, specifically whether the trial court improperly curtailed the effectiveness of Kennedy's lay witness testimony by precluding specific opinions or words from being presented to the jury, shows that Kennedy's initial framing of the issue is not correct. This is not a case where the trial court fully excluded lay witness testimony from the jury. Rather, as Kennedy notes in his briefing and the record reflects, lay witnesses were permitted to testify regarding their observations of the

intersection over time and their direct perceptions of activities that occurred there. This testimony is consistent with the specifics of the trial court's order. For example, with respect to Katen, the court expressly stated she could "testify with regard to her personal observations with regard to the intersection." Katen then testified about her observations of the intersection going back to 1986.

Kennedy's brief proceeds on the assertion that the trial court's ruling was erroneous and subject to de novo review because it wholly misunderstood the legal framework. A lay witness is fully competent to testify regarding their perceptions of an incident, provided their testimony is relevant and legally competent. (See *People v. Gosset* (1892) 93 Cal. 641, 645–646 [witnesses may testify to perception and to pre-existing knowledge related thereto].) Upon review, it is apparent that the trial court correctly understood this concept and permitted the witnesses to testify regarding their direct perception. The limitations imposed arose where lay witnesses wished to go further and summarize their perceptions through recitation of an opinion. As noted above, such opinions may be permitted under appropriate circumstances and our review of such decisions asks whether the trial court abused its discretion. (See *People v. McAlpin*, *supra*, 53 Cal.3d at p. 1306; *Ceja v. Department of Transportation*, *supra*, 201 Cal.App.4th at p. 1481.) As the trial court's order here did not wholly exclude lay witness testimony relevant to whether the intersection was dangerous, we conclude the court properly understood the law and entered a ruling subject only to an abuse of its discretion. We thus next consider whether the trial court did, in fact, abuse its discretion in excluding lay witness opinion testimony on whether the intersection was dangerous. As explained below, we conclude it did not.

*Excluding Lay Witness Opinion Testimony Was Not An Abuse Of Discretion*

As codified, Kennedy's theory of liability in this case arose under Government Code section 835, which provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes

that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his [or her] employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition under [Government Code s]ection 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

Under Government Code section 830, subdivision (a), a dangerous condition is "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." And, in line with the statutory exceptions noted in Government Code section 835, under Government Code section 830.4: "A condition is not a dangerous condition … merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs, as described by the Vehicle Code, or distinctive roadway markings as described in [s]ection 21460 of the Vehicle Code."

Accordingly, as the trial court appeared to recognize, Kennedy's theory of liability could not turn on contentions concerning the lack of a traffic signal or other clear liability demonstrating dangerousness. Indeed, Kennedy's argument relied upon a combination of factors demonstrating that some aspect of the construction or engineering of the intersection was dangerous in light of conditions that were known at the time or came to be known later. As the parties discussed this issue, Kennedy conceded the lay witness opinion testimony was not intended to confirm the intersection was, in fact, dangerous, but rather to provide witness opinions based on how they viewed their interactions with the intersection, his counsel stating: "A layperson can come in and say, 'I can't get through [the] intersection, it's so busy and crowded it's dangerous.' A lay person [*sic*]

10.

isn't going to come in and say, 'You know, I measured the intersection, and it was 19 feet this way and that makes it'—the lay person [*sic*] is doing the same thing the person with the stop sign is doing. This stop sign is dangerous, I avoid that because you can't see the stop sign concept." The court, however, rejected this contention noting that the determination whether an intersection was dangerous in this case was more complex and excluded the proffered testimony because, with respect to the notion of what is "dangerous and [a] dangerous condition, I have a concern that the jury could see it as interchangeable."

Kennedy argues this determination was erroneous. In support of his contention, Kennedy relies on cases such as *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 844–845, *Bakity v. County of Riverside* (1970) 12 Cal.App.3d 24, 28–29, and *Bennett v. Kings County* (1932) 124 Cal.App. 147, 149–150, among others, for the proposition that California law has long permitted the use of lay witness testimony on the dangerousness of road conditions. Kennedy himself, explains however, that in each of these particular cases "the lay opinion was regarding the physical characteristics of the dangerous condition." In this sense, then, the testimony was not lay opinion testimony, but lay witness testimony regarding the witnesses' actual perceptions. Kennedy notes the witness in *Bennett* was permitted to testify further as to their opinion that the bridge at issue in that case was dangerous because of the nature of a turn leading into it. (*Bennett*, at pp. 149–150.) However, even in that case, there was no general rule enunciated stating that such lay witness opinion testimony is always permissible.

As discussed above, the general rule is that lay witness opinion testimony should be permitted " 'only where helpful to a clear understanding of the witness's testimony [citation], "i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed." ' " (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 130.) Thus, where a witness observes a dangerous condition and, based on that observation, opines that the intersection is dangerous, such testimony may be permitted where the opinion

11.

offered is helpful to understanding the witness's connection between the condition observed and the issue of dangerousness.

As Kennedy correctly notes, in this case lay witnesses can readily testify that "the area changed dramatically since the intersection … was constructed; or how busy and congested the intersection was; or the problems motorists experienced in attempting to make left-turns [*sic*] or U-turns from northbound Cedar Avenue; or that motorists making left-turns [*sic*] and U-turns jumped the green and ran the red lights, or sat and waited for multiple cycles while traffic backed up behind them." Each of these observations could rationally be based on direct observations. However, to take the next step and provide a lay opinion that the intersection was dangerous, there would need to be a connection between the increased traffic, driver activity, or other observation, and the dangerous condition alleged, otherwise the opinion would not be helpful to understanding the witnesses' testimony.

In this case, that connection is complicated. Unlike cases such as *Carson v. Facilities Development Co.*, *supra*, 36 Cal.3d at pages 844–845, where the underlying issue was whether an intersection was dangerous because a stop sign was obstructed by objects on land owned by the city, or *Bakity v. County of Riverside*, *supra*, 12 Cal.App.3d at page 29, where again a stop sign was obscured, this time by shade from street-side trees, the most obvious basis for asserting dangerousness here, the lack of a light controlling the busy intersection, was not a legitimate basis for liability given the immunity provided by the Government Code. While expert testimony was not required to support a jury verdict that the intersection was, in fact, dangerous, the court was tasked with determining whether lay witnesses could go beyond reciting facts about the intersection they had seen from which the jury could determine dangerousness to opining for the jury whether those observations evidenced dangerousness without obscuring that dangerous conditions based on the lack of a left-turn light were legally irrelevant.

12.

Upon review, we do not see the trial court's determination in this case that such lay witness opinion testimony should be excluded as an abuse of discretion. Unlike those cases where the connection between the witnesses' observations and their opinion on dangerousness rendered their opinions helpful to understanding their testimony, in this case there is legitimate debate whether such opinions would be helpful. As the trial court noted in its order denying Kennedy's motion for new trial, extensive perception evidence was permitted from various sources while Kennedy's theory of liability turned in part on engineering requirements and a combination of factors related to traffic at the intersection. Ultimately, the trial court's line-drawing, in permitting general observations but excluding lay opinions on the ultimate issue of dangerousness, was consistent with the legal precedent and did not exceed any logical bounds. The court was thus acting within its proper discretion when it permitted factual testimony from lay witnesses but excluded lay opinions.

### *The Trial Court's Exclusion of Notice Evidence Was Harmless*

Kennedy's next assertion of error contends that the trial court incorrectly and prejudicially excluded evidence prior to 1994, offered "to show [Fresno] had notice of the dangerous condition" alleged in the second amended complaint. Kennedy identifies both documentary and testimony evidence, dating back to 1979, that suggests people were complaining to Fresno about the intersection. The trial court, however, limited the introduction of such evidence to events occurring after Fresno conducted a left-turn study in 1994. Kennedy alleges this restriction on evidence was incorrect and prejudicial. Having concluded the court did not error in limiting the lay witness opinion testimony on dangerousness, as discussed above, we conclude that even if an error occurred in the context of the notice evidence, the error was harmless.

*Standard of Review*

"No judgment shall be set aside, or new trial granted, in any cause, … for any error as to any matter of procedure, unless, after an examination of the entire cause,

including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) "Although the *Watson*[2] standard is most frequently applied in criminal cases, it applies in civil cases as well." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801.) "Accordingly, errors in civil trials require that we examine 'each individual case to determine whether prejudice actually occurred in light of the entire record.' " (*Id*. at pp. 801–802.)

*The Jury's Verdict Shows Any Error Is Harmless*

In this case, the jury was presented with a special verdict form. The first question asked whether Kennedy had proven a dangerous condition existed at the intersection. Only after answering that question was the jury tasked with considering whether or not Fresno had notice of that condition. The jury concluded that no dangerous condition existed and thus did not reach the notice question. Kennedy contends that the exclusion of evidence suggesting notice prior to a study from Fresno wrongly implies either that there could not be a dangerous condition prior to doing a study or that Fresno could not have notice of a dangerous condition until it investigates the area.

Even assuming error, however, Kennedy cannot demonstrate prejudice warranting reversal. The special verdict form in this case separated the issue of a dangerous condition at the intersection from the issue of whether Fresno had notice of that condition. The jury's verdict in the negative on the first issue rendered evidence related to the later issue immaterial, as knowledge of a condition of property in this case is irrelevant if the condition is not dangerous. (See, e.g., *Adams v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 617 ["Stated from another perspective, the answers to the questions in the special verdict forms regarding private nuisance provide this court with sufficient information to conclude that the unsuccessful plaintiffs were not affected or damaged by defendants' substantial failure to provide and maintain the physical

---

**2**     *People v. Watson* (1956) 46 Cal.2d 818, 836.

improvements of the Park and the common facilities in good working order and condition"].)

We note that the jury verdict itself, while compelling, is not wholly dispositive of this issue. (See *Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606, 633–634 ["California courts are required to conduct 'an examination of the entire cause.' … Under this constitutional directive, courts must determine the question of prejudice based on the facts and circumstances of the particular case"].) As discussed above, Kennedy principally argues this evidence was offered "to show [Fresno] had notice of the dangerous condition." However, Kennedy hints and Fresno responds as if the evidence may also have been relevant to show a dangerous condition existed. To the extent this argument parallels Kennedy's first point, we reach no different conclusion with respect to the court's decision to exclude lay opinions of dangerousness. Further, to the extent Kennedy contends the evidence supports a finding of dangerousness at the time of the accident, we see no harm in the court's exclusion of such evidence given it permitted evidence of a similar nature beginning in 1994. Accordingly, upon a full review of the case and the evidence presented, we conclude that even if error is found on this issue, any error was harmless and does not warrant reversal.

### The Exclusion of Post-Accident Impeachment Evidence Was Harmless

Kennedy's final assertion of error contends that the trial court incorrectly and prejudicially excluded relevant impeachment evidence following an overly broad ruling excluding all evidence of dangerousness following the date of the accident. In particular, Kennedy identifies a resolution from Fresno State Associated Students, Inc. alleging the intersection is dangerous and a letter sent by a traffic officer noting the number of tickets written and collisions at the scene over a period of time as evidence he intended to introduce to impeach Fresno's claims the intersection was not deemed dangerous. Kennedy claims this evidence was admissible both as impeachment evidence and as evidence of a dangerous condition generally.

15.

We do not agree. To the extent the contested evidence is offered as affirmative lay opinions on the dangerousness of the intersection, our discussion of that issue, above, controls and we find no error in limiting the nature of the evidence permitted. Further, to the extent any error can be shown in excluding the evidence for impeachment purposes, we conclude that error is harmless. The relevant question on this issue is whether, given the permissible scope of evidence that could be offered, " 'a different result would have been probable if such error … had not occurred or existed.' " (*Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199, 220–221; see Cal. Const., art. VI, § 13.) Upon review of the record in his case, we conclude that Kennedy was permitted to and did introduce numerous pieces of evidence regarding complaints about the intersection from at least 1994 until the time of the accident. The jury was thus presented with more than a minimal amount of substantially similar evidence and rejected that evidence in finding the intersection was not, in fact, dangerous at the time of the accident. We see nothing in the additional evidence discussed with respect to this issue that meaningfully differentiates it from the evidence rejected by the jury and conclude Kennedy has not demonstrated any alleged error in excluding the evidence was prejudicial in this instance.

### *Fresno's Settlement Offer Was Invalidly Overbroad*

In its cross-appeal, Fresno contends the trial court erred in denying Fresno's request for expert costs because it incorrectly determined that Fresno's pretrial settlement offer pursuant to section 998 was overbroad and thus invalid. We do not agree.

*Factual Background*

Prior to trial in this case, Fresno sent Kennedy a settlement offer, purportedly arising under section 998. In relevant part, the offer stated that "Defendant, [] FRESNO, offers to settle with Plaintiff, [] KENNEDY, in the above-entitled action pursuant to [s]ection 998 of the Code of Civil Procedure for the payment of the sum of $50,001.00 (Fifty Thousand One Dollars), in exchange for a dismissal of plaintiff's entire case with prejudice and full release including [] Civil Code section 1542 waiver of all claims

16.

against defendant, [] FRESNO." (Italics omitted.) Kennedy did not respond to this offer. After the defense verdict issued in this case, Fresno sought its expert costs under section 998, an amount eventually totaling more than $266,000. The trial court rejected this request. According to the court, while the settlement offer was made in good faith and met the basic statutory requirements, the unqualified requirement to waive all claims under Civil Code section 1542 (section 1542) meant "the offer was not sufficiently specific to permit meaningful evaluation."

*Standard of Review and Applicable Law*

"We independently review whether a section 998 settlement offer was valid. In our review, we interpret any ambiguity in the offer against its proponent. [Citation.] The burden is on the offering party to demonstrate that the offer is valid under section 998. [Citation.] The offer must be strictly construed in favor of the party sought to be bound by it." (*Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81, 86 (*Ignacio*).)

Under section 998, "any party may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time." (Code Civ. Proc., § 998, subd. (b).) If a defendant makes a proper offer that is not accepted, and the plaintiff fails to recover more than that offer, the trial court "in its discretion, may require the plaintiff to pay a reasonable sum to cover postoffer costs of the services of expert witnesses." (*Id.* at subd. (c)(1).)

"It is well established that a purported section 998 offer 'requiring the release of claims and parties not involved in the litigation is invalid.' [Citation.] 'That limitation exists because of the difficulty in calculating whether a jury award is more or less favorable than a settlement offer when the jury's award encompasses claims that are not one and the same with those the offer covers. [Citations.]' [Citation.] If the settlement offer includes 'terms or conditions, apart from the termination of the pending action in exchange for monetary consideration, that make it exceedingly difficult or impossible to

17.

determine the value of the offer to the plaintiff,' the offer is invalid under section 998. [Citation.] Requiring resolution of potential unfiled claims not encompassed by the pending action renders the offer incapable of valuation." (*Ignacio*, *supra*, 2 Cal.App.5th at pp. 86–87.)

Under section 1542, "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

*Discussion*

In this case, the trial court reviewed Fresno's offer, including its required waiver of the protections afforded by section 1542, and concluded the offer was sufficiently overbroad and vague to render it invalid. Fresno recognizes that broad general waivers, including a section 1542 release, may be deemed invalid but contends the cases reaching such results include additional facts, such as readily identifiable additional claims or additional broad language offered as part of the settlement. Although Fresno's analysis is well taken, we ultimately agree with the trial court that under the facts of this case, Fresno's request for a general release and waiver of section 1542's protections invalidated its purported offer under section 998.

As explained in *Ignacio*, there is a historical debate regarding the appropriateness of general releases in the context of section 998 offers which has been bypassed by generally confirming the principle that section 998 releases must be limited to the claims raised in the pending litigation. (*Ignacio*, *supra*, 2 Cal.App.5th at p. 89 ["In other words, the *Goodstein*[3] majority upheld the validity of the section 998 offer by construing the term 'general release' more narrowly than its then-established common meaning. The rule to be taken from *Goodstein* is not that a 'general release' does not invalidate a

---

**3**      *Goodstein v. Bank of San Pedro* (1994) 27 Cal.App.4th 899.

18.

section 998 offer; the rule is that a release of unknown claims arising only from the claim underlying the litigation itself does not invalidate the offer"].) Fresno claims its offer meets this requirement and cites to cases such as *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720 (*Fassberg*), *Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259 (*Linthicum*), and *Goodstein* as examples of release language it claims is similar to that it employed. We do not agree that Fresno's offer is sufficiently similar to those found permissible above to render it proper.

In the context of Fresno's arguments, *Fassberg* presents a favorable factual situation. In that case, the defendant offered the plaintiff a substantial settlement offer "in exchange for the entry of mutual requests for dismissal with prejudice of the entire action and the execution of a proposed settlement agreement and mutual release." (*Fassberg*, *supra*, 152 Cal.App.4th at p. 765.) As the court noted, the release language was "particularly exhaustive." (*Id*. at p. 767.) It included broad language regarding derivative actions, substantial lists of potentially affected parties, and also a section 1542 waiver. (*Id*. at p. 765.)

The trial court found the offer overbroad. The appellate court reversed. In doing so, the court first noted that an offer should be "evaluated in light of all of its terms and conditions," (*Fassberg*, *supra*, 152 Cal.App.4th at p. 766) before explaining that the release truly only affected two parties and specifically defined the subject matter of the settlement "as '[a]ny and all claims, causes of action, matters alleged or which could have been alleged in [this action], including the cross-complaint by the Housing Authority.' " (*Id*. at p. 767.) This later language was particularly important, as the court explained it constituted an "attempt to define the subject matter of the settlement and release to encompass the whole of the action." (*Ibid*.) Based on this, the court concluded that "[a]bsent some indication of the existence of a valuable claim in favor of a related person or entity, independent of Fassberg's actual and potential claims arising from the subject

19.

matter of this action, that would be extinguished by the release, we conclude that the release is not overbroad or incapable of valuation." (*Ibid*.)

In this case, Fresno's offer begins as a limited section 998 offer, seeking settlement "in the above-entitled action pursuant to [s]ection 998" in "exchange for a dismissal of plaintiff's entire case with prejudice." Had the offer stopped there, there is no doubt it would have been sufficient. However, Fresno then continued to request an additional "full release including [] Civil Code section 1542 waiver of all claims against" Fresno. (Italics omitted.) This final clause could reasonably be read to extend well beyond the claims asserted in the present litigation to include any and all other claims, whether known or unknown, that Kennedy may have had against Fresno at the time. Unlike *Fassberg* and the similar cases cited by Fresno, the language of the purported offer contains no clear attempt to define the subject matter of the settlement as only those claims part of the subject litigation.[4] Rather, the offer appears to separate itself into an offer to settle the current claims and a requirement that Kennedy release all other potential actions. Thus, in its offer, Fresno appears to have reasonably sought to ensure settlement of all potential claims, a common tactic to ensure no later litigation emerges. However, in failing to specifically note that its offer was limited only to those claims relating to the current action, for example those currently permitted to be raised between the parties in the pending litigation, it strayed from the line of cases permitting potentially broad general releases when the underlying subject matter is specifically defined and instead utilized overbroad language that invalidated its settlement offer under

---

**4**     We note we agree generally with *Linthicum*'s statement that the general rule is not that an "offer must contain any particular language." (*Linthicum*, *supra*, 175 Cal.App.4th at p. 272.) However, the language used must be sufficiently clear, in context, that courts can properly evaluate the comparative value of the offer with the ultimate resolution; with the burden being placed on the offering party to show such clarity. (*Ignacio*, *supra*, 2 Cal.App.5th at pp. 86–87.) In this case, we conclude that, in context, the language Fresno utilized did not properly limit its offer and left open the possibility of a full waiver of unknown and unasserted claims unrelated to the pending litigation, rendering evaluation difficult if not impossible.

section 998.  The trial court thus correctly concluded that Kennedy's failure to accept the settlement offer did not trigger the cost shifting structure of section 998.

## DISPOSITION

The judgment and order taxing costs are affirmed.  Both parties shall bear their own costs on appeal.


HILL, P.J.

WE CONCUR:


DETJEN, J.


SMITH, J.

21.